**2020 UT App 35**

# THE UTAH COURT OF APPEALS

V.M.,
Appellant,
*v.*
DIVISION OF CHILD AND FAMILY SERVICES,
Appellee.

Opinion
No. 20180906-CA
Filed March 5, 2020

Fourth District Juvenile Court, Provo Department
The Honorable Brent H. Bartholomew
No. 1155142

Andrew G. Deiss and John Robinson Jr., Attorneys
for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES KATE APPLEBY and DAVID N. MORTENSEN concurred.

POHLMAN, Judge:

¶1    V.M. appeals the juvenile court's order substantiating a finding of the Division of Child and Family Services (DCFS) that V.M. sexually abused a child. We affirm.

## BACKGROUND

¶2    In 2015, a minor child (Child) alleged that V.M., her brother-in-law, sexually abused her. The State charged V.M. with aggravated sexual abuse of a child. The criminal case went to trial and resulted in an acquittal.

¶3　Separately from the criminal case, DCFS conducted an investigation into the allegation against V.M. As a result of that investigation, DCFS made and entered a supported finding against V.M. for sexual abuse of a child. *See* Utah Code Ann. § 62A-4a-101(41) (LexisNexis 2018) ("'Supported' means a finding by the division based on the evidence available at the completion of an investigation that there is a reasonable basis to conclude that abuse, neglect, or dependency occurred.").

¶4　Although a copy of the agency's decision was sent to V.M.'s last known address, V.M. never received it. Instead, he discovered it in 2017 when he underwent a background check. He requested an administrative hearing on the matter. After an internal review, DCFS upheld its supported finding of sexual abuse of a child.

¶5　V.M. then initiated the present action in juvenile court, seeking judicial review of DCFS's decision. *See generally id.* § 63G-4-402(1)(a)(iii) (2016) (explaining that juvenile courts have jurisdiction over all state agency actions relating to "substantiated findings of abuse or neglect made by the Division of Child and Family Services"); *id.* § 78A-6-323(1)(a) (2018) (providing that upon the filing of a petition by DCFS "or any interested person" informing the court "that the division has made a supported finding that a person committed a severe type of child abuse or neglect," the juvenile court shall, among other things, "make a finding of substantiated, unsubstantiated, or without merit").

¶6　The juvenile court held a two-day trial in September 2018. At the beginning of the trial, DCFS announced its intention to play the video of Child's forensic interview, and it indicated its understanding that V.M. would play the audio of Child's testimony at his criminal trial and then Child would testify in the juvenile court. When the juvenile court asked whether that

procedure was acceptable, V.M. indicated that it was "fine with [him]." The trial then proceeded in that fashion.

¶7     While the audio of Child's trial testimony played, V.M. observed that the "quality [of the audio] is a little hard" and offered to provide a transcript for the juvenile court and others to use for "follow[ing] along" with the audio. V.M. then moved to admit the transcript of Child's trial testimony, and the court granted the motion.

¶8     When Child testified in the juvenile court, she said that she remembered her forensic interview and testifying at V.M.'s criminal trial. When asked whether she remembered the specifics of her statements during the forensic interview, Child responded, "Not the specifics, but like vaguely. I just remember I was just nervous, and I just told everything I knew." When DCFS asked Child whether she told the truth in the forensic interview and at the criminal trial, Child responded affirmatively. In the juvenile court proceedings, however, Child did not independently testify about the abuse.

¶9     Child's mother testified, as did an employee of Brigham Young University (BYU) responsible for investigating allegations of sexual misconduct involving students. The employee testified that based on his investigation of V.M., who was a BYU student at the time of the alleged abuse, there was insufficient evidence to find that V.M. had violated BYU's policies on sexual misconduct and child protection.

¶10     On the second day of trial in juvenile court, V.M. asked to telephone his next witness: the individual (Forensic Interviewer) who conducted the forensic interview of Child. When the court reached Forensic Interviewer by phone, she said that she was unavailable to testify. V.M. then proposed that the court read Forensic Interviewer's testimony from V.M.'s criminal trial, telling the court, "[E]verything that you need is in the transcript." The juvenile court admitted the transcript of that

testimony into evidence. At V.M.'s request, the court also admitted the transcripts of his ex-wife's testimony from his criminal trial. Additionally, V.M. played the audio recording of a conversation between Child and her parents. V.M. also asked for and received the admission of a transcript of that conversation; the transcript of Child's aunt's testimony at the criminal trial; and two declarations from the aunt, which, V.M. asserted, had bearing on Child's "reputation for truthfulness." Finally, V.M. testified before the juvenile court and denied abusing Child.

¶11  After trial, the juvenile court entered a written order. It found, based on a preponderance of the evidence, that when Child was eleven years old and visiting the home of her sister and V.M., V.M. sexually abused Child.[1]

¶12  The juvenile court found that shortly after the abuse, Child's parents spoke with Child to find out what had happened. The court found that the parents' inquiry, which they recorded, "was innocently done and did not taint the evidence later presented by [Child]."

¶13  The juvenile court further found that Child's parents also arranged for Child to talk to a professional experienced in working with victims of sexual abuse. Once or twice before the interview with Forensic Interviewer, Child spoke with the professional because Child was "uneasy about talking about what [V.M.] had done to her." The juvenile court found that the purpose of these conversations was for "strength and support" and "not for coaching [Child] on what to say" to Forensic Interviewer.

¶14  The juvenile court also found that no one had told Child "what to say" during the forensic interview. The adults in

---

1. Because the details of the abuse are not relevant to the issues on appeal, we do not repeat them here.

Child's life "all encouraged [Child] to tell the truth about the incident" with V.M., and the court found that Child did in fact tell the truth.

¶15 Indeed, the juvenile court found that Child's testimony at the criminal trial and in the forensic interview was "believable and credible." According to the court, Child was "detailed in her description" of the abuse and she "was certain that [V.M.] was her abuser." Child had "no motive to accuse" V.M. To the contrary, Child "found it difficult to comprehend that [V.M.] would knowingly touch her inappropriately" and even suggested that V.M. "might have been sleepwalking or not feeling well" when he abused her. The court also found that Child "displayed discomfort" in describing the abuse, did "not blurt out a rehearsed story," and did not "appear to have been coached on what to say."

¶16 The court further found that Forensic Interviewer "used proper protocol" in conducting the forensic interview of Child. In so finding, the court relied on the video of the forensic interview and Forensic Interviewer's testimony given at the criminal trial. The court noted that Forensic Interviewer's testimony was "credible."

¶17 The juvenile court's written order also included its conclusions of law. It began by explaining that DCFS had the burden to prove, by a preponderance of the evidence, that abuse or neglect occurred and that V.M. was substantially responsible for that abuse or neglect. *See generally* Utah Code Ann. § 62A-4a-1009(5)(a) (LexisNexis 2018). The court gave "little to no weight" to the fact that criminal charges against V.M. ultimately were dismissed and expunged, noting that the preponderance of the evidence standard applicable in the juvenile court proceeding is "lower than the beyond a reasonable doubt evidentiary standard used in the district court's criminal trial."

¶18 Similarly, the court gave "little weight" to the BYU investigation because it was "conducted for a different purpose" than the DCFS investigation and because the BYU investigator considered only information provided by V.M. The court noted that it had the "advantage" over the BYU investigator of "hearing directly from and meeting with [Child] through her testimony in court during the juvenile court trial."

¶19 As a result of its findings of fact and conclusions of law, the juvenile court substantiated DCFS's finding against V.M. for sexual abuse of a child. *See id.* § 62A-4a-101(39). The court accordingly dismissed V.M.'s petition. V.M. appeals.

ANALYSIS

¶20 On a petition informing the court "that the division has made a supported finding that a person committed a severe type of child abuse or neglect as defined in Section 62A-4a-1002," the juvenile court shall, among other things, "make a finding of substantiated, unsubstantiated, or without merit."[2] Utah Code Ann. § 78A-6-323(1)(a) (LexisNexis 2018); *see also id.* § 63G-4-402 (2016) (explaining that juvenile courts have jurisdiction over all state agency actions relating to "substantiated findings of abuse or neglect made by the Division of Child and Family Services"). During the proceeding on such a petition, the juvenile court

---

2. "'Substantiated' or 'substantiation' means a judicial finding based on a preponderance of the evidence that abuse or neglect occurred." Utah Code Ann. § 62A-4a-101(39) (LexisNexis 2018). "Unsubstantiated," in contrast, "means a judicial finding that there is insufficient evidence to conclude that abuse or neglect occurred." *Id.* § 62A-4a-101(44). And "without merit" includes a judicial finding "that the alleged abuse, neglect, or dependency did not occur, or that the alleged perpetrator was not responsible for the abuse, neglect, or dependency." *Id.* § 62A-4a-101(46).

reviews DCFS's finding "by trial de novo," *id.* § 63G-4-402(1)(a), and DCFS has "the burden of proving, by a preponderance of the evidence, that abuse, neglect, or dependency occurred and that the alleged perpetrator was substantially responsible for the abuse or neglect that occurred," *id.* § 62A-4a-1009(5)(a) (2018).

¶21　The preponderance of the evidence standard generally "requires the proponent of a contested fact to demonstrate that its existence is more likely than not." *Harken Sw. Corp. v. Board of Oil, Gas & Mining*, 920 P.2d 1176, 1182 (Utah 1996); *see also Alvarado v. Tucker*, 268 P.2d 986, 988 (Utah 1954) (defining preponderance of the evidence as the "greater weight of the evidence" in favor of the prevailing party). This standard of proof is lower than the beyond a reasonable doubt standard applicable to criminal defendants. *See Egbert v. Nissan N. Am., Inc.*, 2007 UT 64, ¶ 12, 167 P.3d 1058; *In re L.N.*, 2004 UT App 120, ¶ 8 n.2, 91 P.3d 836.

¶22　On appeal, V.M. contends that the juvenile court committed an error of law in (A) relying on the paper transcript of Child's testimony from his criminal trial to determine the credibility of Child's story and (B) relying on the transcript of Forensic Interviewer's trial testimony to determine that Forensic Interviewer was credible. According to V.M., "it's black letter law that credibility can only be determined from live testimony" and "[c]redibility simply cannot be determined from a cold transcript." Because the juvenile court used both transcripts when deciding that Child's allegations of abuse were substantiated, V.M. asserts that "a single error of law—the court's mistaken premise that paper transcripts could be used for credibility—infected the [juvenile court's] entire decision."

A

¶23　With regard to Child—whose "testimony at trial and the [forensic] interview" the juvenile court found to be "believable and credible"—V.M. contends that because Child "did not tell

her story" of the abuse to the juvenile court, the court improperly relied on the transcript of her testimony from V.M.'s criminal trial to find Child credible. V.M. argues that live testimony was essential to the court's credibility assessment because the court could not assess Child's credibility without observing her demeanor. We reject V.M.'s argument both because the juvenile court relied on more than just the transcript of Child's trial testimony and because we do not agree that paper transcripts can never be used in evaluating a witness's credibility.

¶24 First, to aid its assessment of Child's credibility, the juvenile court was able to observe Child's demeanor in a handful of ways. Specifically, the court listened to the audio recording of Child's trial testimony and it relied on the transcript—at V.M.'s urging—to follow along. By listening to the audio recording, the court could hear Child's tone of voice and how she responded to questioning, both of which could factor into its assessment of her credibility.[3] The court also watched Child's forensic interview, and by doing so, it could observe Child's outward demeanor as she described the abuse. Finally, Child testified before the juvenile court, and although she did not independently testify about the abuse during that testimony, the juvenile court could still take stock of Child's general characteristics as a witness and compare them with her forensic interview and the transcript of her testimony during the criminal trial. *Cf. In re M.A.V.*, 736 P.2d 1031, 1033 n.1 (Utah Ct. App. 1987) (noting that where a judge had "*heard* [a witness's deposition] testimony 'live'" and "had seen and heard from" the witness at two other hearings, the "court accordingly had more opportunity to take the measure of [the witness] and evaluate his credibility, demeanor, and

---

3. V.M. also played for the court an audio recording of Child discussing the abuse with her parents.

attitude than would ordinarily occur where a deposition transcript had to be relied upon").

¶25 Because the court had before it the video of Child's forensic interview as well as the audio and transcript of Child's testimony at the criminal trial, a recording of her conversation with her parents, and Child's in-person testimony,[4] we reject the premise of V.M.'s argument: that the court relied solely on "a cold transcript" in crediting her allegations of abuse.

¶26 Second, we agree with V.M. that the "'importance of live testimony to a credibility determination is well recognized and longstanding.'" (Quoting *Oshodi v. Holder*, 729 F.3d 883, 891 (9th Cir. 2013).) It is one of the reasons "credibility determinations are within the province of the district court judge," who is best positioned to make factual findings based on oral testimony "due to his or her opportunity to view the witnesses firsthand, to assess their demeanor, and to consider their testimonies in the context of the proceedings as a whole." *Meyer v. Aposhian*, 2016 UT App 47, ¶ 13, 369 P.3d 1284 (cleaned up); *see also* Utah R. Civ. P. 52(a)(4) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the credibility of the witnesses."); *Henshaw v. Henshaw*, 2012 UT App 56, ¶¶ 11–12, 271 P.3d 837 (explaining that trial courts are "better equipped to make credibility determinations based on conflicting oral evidence than an appellate court that has access only to the cold record").

¶27 Yet V.M. has not persuaded us that black letter law prohibits fact-finders *in all circumstances* from considering

---

4. V.M. does not challenge the admission of any evidence, including the transcripts or the video. Nor does he complain that the court listened, at his urging, to the audio recording.

transcripts in making credibility determinations.[5] After all, "factors other than demeanor and inflection go into the decision whether or not to believe a witness." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). "Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id.*; *see also Jackson v. United States*, 353 F.2d 862, 866 (D.C. Cir. 1965) ("Credibility involves more than demeanor. It apprehends the overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence." (cleaned up)); *cf. Smith v. Freeman*, 902 N.E.2d 1069, 1075 (Ill. 2009) ("It is a common practice for a judge, and even a jury, to make credibility determinations based on

5. To the contrary, Utah law permits the use of transcripts at trial in some scenarios. For instance, the Utah Rules of Civil Procedure allow, under certain conditions, the use of depositions in court proceedings "for any purpose." Utah R. Civ. P. 32(a)(2), (3); *see also id.* R. 32(e) ("Except as otherwise directed by the court, a party offering deposition testimony pursuant to this rule may offer it in stenographic or nonstenographic form, but, if in nonstenographic form, the party shall also provide the court with a transcript of the portions so offered."). And the Utah Rules of Evidence allow, under certain conditions when a witness is unavailable, the admission of testimony that "was given as a witness at a trial, hearing, or lawful deposition." Utah R. Evid. 804(a), (b)(1) (setting forth when former testimony is not excluded by the rule against hearsay). Neither one of these rules suggests that credibility determinations from such non-live testimony are impossible. Indeed, when V.M. advised the court that he would be seeking to admit transcripts of the criminal trial testimony of his ex-wife and Child's aunt due to their unavailability, the court noted its ability to assess their credibility through means other than observing their demeanor.

transcripts of testimony."). And as we regularly instruct our juries, factors such as personal interest, bias, knowledge, memory, consistency, and reasonableness can aid a factfinder in the assessment of a witness's credibility. *See* Model Utah Jury Instructions 2d CV121 (2018); *see also id.* CR207.

¶28 Thus, while we readily agree that viewing a witness firsthand is generally a superior way to evaluate his or her credibility, and while we do not question the value of live testimony, we cannot say that fact-finders are necessarily barred from using a cold transcript to evaluate a witness's credibility in all circumstances. We therefore reject the premise of V.M.'s assertion of error on appeal—that paper transcripts could not be used to judge credibility as a matter of law. And particularly here, where V.M. invited the court to consider Child's trial testimony,[6] we cannot conclude that the court committed legal error by considering the transcript along with the other evidence to determine that Child's allegations were credible.

B

¶29 V.M. likewise assails the juvenile court's reliance on the transcript of Forensic Interviewer's testimony at his criminal trial. As compared to Child, the juvenile court had less opportunity to view Forensic Interviewer's demeanor. But it had the transcript of her testimony from the criminal trial, it had the opportunity to view her demeanor by watching the forensic interview she conducted, and it could compare the interview with Forensic Interviewer's testimony about it. Thus, although

---

6. Given that a jury had acquitted V.M. based on the testimony that Child gave at the criminal trial, V.M. may have, for strategic reasons, preferred that the juvenile court consider Child's trial testimony rather than see Child testify to the details of the abuse in person.

the court depended largely on the transcript to assess Forensic Interviewer's credibility, its assessment was not strictly based on the transcript alone.

¶30    Still, even if the juvenile court had relied only on the transcript to judge Forensic Interviewer's credibility, that is exactly what V.M. invited the court to do. An alleged error is invited when an appellant encourages the court to take the action he later challenges on appeal, and we will not reverse a court's decision under such circumstances. *See State v. McNeil*, 2016 UT 3, ¶ 17, 365 P.3d 699; *Pratt v. Nelson*, 2007 UT 41, ¶ 17, 164 P.3d 366. When Forensic Interviewer was unable to testify, V.M. suggested that the court read her testimony, including cross-examination, from V.M.'s criminal trial. Though V.M. claims that he "never affirmatively invited the court to use paper transcripts for credibility determinations," he told the court, without limitation, that "everything that [it] need[s] is in the transcript." V.M. has not explained what he expected the court to do with Forensic Interviewer's testimony if not assess her credibility on some level. By introducing the transcript and inviting the court to consider her testimony in evaluating the case, V.M. affirmatively and necessarily led the court to assess Forensic Interviewer's credibility without personally observing her demeanor. We therefore cannot fault the juvenile court for its use of Forensic Interviewer's transcript.

¶31    Further, even if V.M. did not invite this alleged error, he has not shown he was harmed by the court's assessment of Forensic Interviewer's credibility in the absence of in-person testimony. *See* Utah R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); *see also* Utah R. Juv. P. 2(c) ("In substantiation proceedings, the procedure set forth in U.C.A. 63G-4-402(2) shall apply."); Utah Code Ann. § 63G-4-402(2)(b) (LexisNexis 2016) (explaining that substantiation proceedings are "governed by the Utah Rules of

Civil Procedure"). V.M. states that Forensic Interviewer's "credibility was never at issue in this case," and he has not persuasively argued that had the juvenile court observed Forensic Interviewer's demeanor and live testimony firsthand, its assessment of her credibility and the result of this proceeding would have been any different.

## CONCLUSION

¶32    V.M. has not shown legal error in the juvenile court's evaluation of the evidence in this case. Accordingly, we affirm its substantiation of DCFS's finding against V.M. for sexual abuse of a child.

_____