2024 UT App 117

## THE UTAH COURT OF APPEALS

DALE HARRIS,
Appellee,
*v.*
JUSTIN HUNT,
Appellant.

Opinion
No. 20230753-CA
Filed August 15, 2024

Fifth District Court, St. George Department
The Honorable Keith C. Barnes
No. 230500041

Daniel J. Tobler, Attorney for Appellant

Travis R. Christiansen, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1     Justin Hunt appeals the district court's entry of a civil stalking injunction against him and in favor of Dale Harris. Hunt asserts that the incidents Harris described to the court do not amount to stalking because they do not constitute a course of conduct directed at Harris, and because some of the described incidents lacked sufficient evidentiary support. We reject Hunt's arguments and affirm the entry of the injunction against him.

## BACKGROUND

¶2     In January 2023, Harris filed a request for a civil stalking injunction against Hunt, a man who, at that time, was dating Harris's ex-wife. Harris contended that Hunt had engaged in a

course of conduct directed at him that would cause a reasonable person in his situation to fear for their safety or suffer emotional distress. The conduct Harris described, both in his petition and during his testimony at the eventual hearing, largely consisted of Facebook posts Hunt had made, including the following:

- Sometime between January and May 2022, Hunt apparently posted Harris's full name and address on Hunt's personal Facebook page and stated that Harris "was a convicted criminal, a woman abuser, addicted to child pornography, [a] drug abuser, [and a] manipulator," and in addition that Harris was "a pedophile and . . . into minors." Harris did not provide the court with any printouts or screenshots of these posts; instead, he simply testified that they existed.

- In March 2022, Hunt posted a meme on his personal Facebook page, and he tagged Harris's ex-wife. The meme said, "friend: don't post that, you're just going to stir the pot. me:" and had a picture of a child stirring a pot that had Harris's initials superimposed on it.

- In May 2022, Hunt posted on his personal Facebook page a booking photo of Harris that had been taken when Harris had once been booked into jail.

- In June 2022, Hunt posted on his personal Facebook page that he was "doin bad boy shit" in the town where Harris lived; Hunt did not live in that town.

- In January 2023, Hunt made several posts about Harris on the town's community Facebook page. Harris later testified that the posts accused Harris—who at the time was a town employee—of "shorting the community on hours," of "leading a drug-fueled lifestyle," and of being "a liar." As part of these posts, Hunt also stated that Harris "was abusing women."

¶3 In addition to the various Facebook posts, Harris also asserted that, in September 2022, Hunt had stayed with Harris's ex-wife at a bed-and-breakfast inn that was "right across the street from" Harris's new place of employment, while "knowing that there was a no-contact order between" Harris and his ex-wife.

¶4 After reviewing Harris's petition, the district court granted Harris's initial request for a temporary civil stalking injunction, which was then served on Hunt. On the day after he was served, Hunt requested a hearing at which he could contest the injunction. Hunt apparently also—in a different district court case not at issue in this appeal—sought and obtained a temporary civil stalking injunction against Harris.

¶5 In August 2023, the district court held one combined hearing to consider the propriety of each of the two temporary civil stalking injunctions it had entered between Harris and Hunt. To streamline the hearing, the parties agreed to conform to the "informal trial" procedures set forth in rule 4-904 of the Utah Code of Judicial Administration. During the hearing, four people testified, including Harris and Hunt.

¶6 Harris testified about the course of conduct described above, and he described the impact these incidents had on his life. He stated that he did not personally see Hunt's posts at first, but that "family members" eventually started sending the posts to him and that various other members of his small community—in which he was a public employee—began to repeat some of the things Hunt had said about Harris on Facebook; in particular, Harris claimed that community members began to send him private messages asking him "about drugs." Harris testified that these comments "directly impacted" his employment and caused him to "[leave] that job because of the pressures of the town" and because he no longer felt that he had "the trust of [the] community." He also testified that some of the Facebook posts not only contained information that he contends was false but also

contained certain items of true information—for instance, his full name, his address, and the identity of a person living at his house—that he was surprised Hunt knew, and that this caused him to feel uneasy and unsafe. He identified, in particular, both the incident in which Hunt posted that he was in Harris's small town "doin bad boy shit" as well as the incident in which Harris saw Hunt at the inn across the street from his workplace as conduct that made him feel like Hunt was stalking him.

¶7     For his part, Hunt admitted to making various Facebook posts, including the one with Harris's booking photo and various others alleging that Harris abused women and used drugs. He also admitted to making the post stating that he had been in Harris's town "doin bad boy shit," but he claimed that he hadn't actually been in Harris's town that day. Hunt maintained that his posts had been made on his own personal Facebook page, which he characterized as "private social media that [Harris] has no invitation" to visit. Hunt explained that his Facebook presence was very small; he claimed to "only have like four or five followers." Yet Hunt knew that Harris had looked at his page in February 2022 because Harris had "liked" a posted photo. Hunt testified that he had since blocked Harris, and "everybody associated with" him, from accessing Hunt's Facebook page, but Hunt did not offer any testimony about *when* he blocked Harris from accessing his page. With regard to the assertion that Hunt had visited an inn across the street from Harris's workplace, Hunt testified that he had never stayed overnight at that establishment and "did not stop there that day for one second," although he admitted that, on the day in question, he had been in the town where the inn was located.

¶8     After hearing the testimony, the district court asked both parties whether they would "rather have both of [the injunctions] dismissed or [have] both" of them continue. Harris indicated that he preferred to keep the injunctions in place; Hunt told the court that, if those were the choices, he wanted the injunctions

dismissed. The court then found that both parties had "provided exhibits supporting their own respective positions" and that the parties each had "legitimate concern[s]," and it concluded that the parties had each met their burden of demonstrating that the other had "intentionally or knowingly engaged in a course of conduct which would cause a reasonable person to fear for one's safety or . . . suffer emotional distress." The court therefore ordered that both injunctions were to remain in place. Only the injunction against Hunt is at issue in this appeal.

ISSUES AND STANDARDS OF REVIEW

¶9    Hunt now appeals, and he challenges the court's entry of a civil stalking injunction against him. As a general matter, Hunt challenges the court's determination that he engaged in conduct that amounted to stalking. He specifically challenges the determination that he engaged in a course of conduct consisting of two or more acts directed at Harris. In this context, we review the court's factual determinations for clear error, *see Noel v. James*, 2022 UT App 33, ¶ 10, 507 P.3d 832, but we review its legal conclusions—including its "interpretation and application of" the stalking statute—for correctness, "affording no deference to the district court's legal conclusion," *Baird v. Baird*, 2014 UT 08, ¶ 16, 322 P.3d 728 (quotation simplified). In particular, a court's ruling that a person "direct[ed] his conduct at" a particular individual is considered a legal conclusion that we review for correctness. *Ragsdale v. Fishler*, 2021 UT 29, ¶ 15, 491 P.3d 835.[1]

---

1. This court previously held to the contrary, once characterizing a district court's determination regarding the "directed at" element as a "finding[] of fact" that should be reviewed "for clear error." *Ellison v. Stam*, 2006 UT App 150, ¶ 17, 136 P.3d 1242 (quotation simplified). Although our supreme court, in *Ragsdale v.*

(continued…)

ANALYSIS

¶10    "Under Utah's civil stalking statute, a person who believes
that he or she is the victim of stalking may obtain an injunction
against an alleged stalker." *Ragsdale*, 2021 UT 29, ¶ 25 (quotation
simplified); *see also* Utah Code § 78B-7-701(1)(a)(i). To obtain such
an injunction, the person must show, by a preponderance of the
evidence, that the alleged stalker violated Utah's criminal stalking
statute. *See Ragsdale*, 2021 UT 29, ¶ 25; *see also* Utah Code § 78B-7-
701(3)(a), (5)(b). And our supreme court has noted that, in order
to prove stalking, a two-part showing must be made. *See Ragsdale*,
2021 UT 29, ¶ 25. First, the person seeking a stalking injunction
must show that the alleged stalker "intentionally or knowingly . . .
engage[d] in a course of conduct directed at a specific individual."
Utah Code § 76-5-106.5(2)(a). And in "determining whether a
person's acts constitute a course of conduct," "we do not consider
individual acts in a vacuum" but, rather, "we consider the acts
cumulatively in light of all the facts and circumstances." *Richins v.
Weldon*, 2023 UT App 147, ¶ 53, 541 P.3d 274 (quotation
simplified). Second, the person must show that the alleged stalker
"knows or is reckless as to whether" the cumulative course of
conduct "would cause a reasonable person" in that situation to
either (i) fear for the person's "own safety or the safety of a third
individual" or (ii) "suffer other emotional distress." Utah Code
§ 76-5-106.5(2)(a); *see also Ragsdale*, 2021 UT 29, ¶ 16 (stating that
"the relevant question is whether the conduct would have caused
fear or emotional distress to a reasonable person *in the petitioner's
circumstances*" (quotation simplified)).

¶11    Only the first part of this test is at issue here. That is, Hunt
does not challenge the court's determination that—*if* he engaged

_____

*Fishler*, 2021 UT 29, 491 P.3d 835, did not expressly overrule our
pronouncement in *Ellison*, we must of course follow our supreme
court's admonitions to the extent they are inconsistent with our
own, and we do so here.

in a course of conduct directed at Harris—his actions would have caused a reasonable person in Harris's situation to either (i) fear for their or someone else's safety or (ii) suffer emotional distress. Instead, he focuses his energies on asserting that he did not engage in a course of conduct directed at Harris at all. And in this regard, his arguments break down into two parts.

¶12    First, Hunt asserts that his posts on his personal Facebook page were not "directed at" Harris because Hunt intended them to be seen only by a limited number of followers and not by Harris or anyone in his orbit. But Hunt's subjective intent regarding who he thought was the target of his posts is largely irrelevant. *See Ragsdale*, 2021 UT 29, ¶ 34 (stating that the stalking statute "does not require that the perpetrator intend for his or her message to reach the victim" (quotation simplified)). "In other words, the person toward whom a respondent's behavior is 'directed at' is not necessarily determined by his or her subjective intent. Instead, it is determined by an objective assessment of whether the respondent engaged in conduct prohibited by the stalking statute." *Id.* ¶ 37; *see also id.* ¶ 40 ("[W]hen assessing whether a respondent has engaged in stalking, district courts should determine if the respondent objectively engaged in statutorily proscribed conduct, rather than asking whether the petitioner was the respondent's subjectively intended target."). In *Ragsdale*, our supreme court summed up its analysis by stating that, "regardless of whether a petitioner is a respondent's ultimate target, the fact that the respondent engaged in any act proscribed by the statute two or more times makes his or her conduct 'directed at' the petitioner." *Id.* ¶ 32.

¶13    The stalking statute contains a long and non-exhaustive list of the kinds of acts that can qualify as part of a "[c]ourse of conduct" "directed at or toward a specific individual." Utah Code § 76-5-106.5(1)(a)(i). As relevant here, those acts include:

- acts in which the actor . . . communicates . . . about an individual . . . directly [or] indirectly . . . by any action, method, device, or means;

- when the actor . . . appears at the individual's workplace;

- when the actor . . . sends material by any means . . . for the purpose of . . . disseminating information about . . . the individual to a member of the individual's family or household, employer, coworker, friend, or associate of the individual; or

- when the actor . . . uses a computer, the Internet, text messaging, or any other electronic means to commit an act that is a part of the course of conduct.

*Id.* § 76-5-106.5(1)(a)(i)(A), (B)(II), (IV), (VI).

¶14    We have no trouble concluding that all of Hunt's Facebook posts were incidents in which Hunt "communicate[d] . . . about" Harris "directly . . . by any action, method, device, or means," *see id.* § 76-5-106.5(1)(a)(i)(A), and were actions taken "us[ing] a computer, the Internet, . . . or any other electronic means," *see id.* § 76-5-106.5(1)(a)(i)(B)(VI). All of the posts in question except one—the "doin bad boy shit" post—were *expressly* about Harris; indeed, these posts included mention of either Harris's name or initials. And even the final remaining post is at least arguably about Harris because it included a reference to the town where Harris lived and, in context, could reasonably be interpreted as an intimidatory reference to Harris. Moreover, the Facebook posts Hunt made on the town's community Facebook page, during a time in which Harris was a town employee, were also actions in which Hunt "sen[t] material by any means . . . for the purpose of

. . . disseminating information about" Harris to an "employer, coworker, . . . or associate of" Harris. *Id.* § 76-5-106.5(1)(a)(i)(B)(IV). And this is true even if we assume, for purposes of the discussion and without deciding, that Hunt had no subjective intent that Harris ever see any of the posts. Accordingly, the district court did not err when it determined that Hunt's Facebook posts were actions that formed part of a "course of conduct directed at" Harris, as that term is defined in Utah's stalking statute. *See id.* § 76-5-106.5(1)(a)(i).

¶15 Second, Hunt raises specific factual challenges to two of the incidents: the "doin bad boy shit" post regarding his presence in Harris's town and the incident in which Harris saw him across the street from Harris's workplace. We reject these challenges.

¶16 Hunt makes no effort to deny that he made the post indicating that he had been in Harris's town "doin bad boy shit." But he nevertheless contends that he was not actually in Harris's town on the day he made the post, and he contends that the post therefore cannot constitute an incident of stalking. This argument fails, however, because the post does not have to be factually true in order to constitute an act directed at Harris. The stalking statute contains a separate category for actions in which a person visits an individual's home or workplace, and that category is not necessarily coextensive with the category containing actions involving "communicat[ions] . . . about" the individual. *See id.* § 76-5-106.5(1)(a). The post was potentially problematic because it was arguably a communication about Harris, even if Hunt wasn't actually in Harris's town that day.

¶17 With regard to the visit to the inn, Hunt does not deny that he was present, on the day in question, in the town where the inn is located, but he contends that he never actually stayed at the inn overnight or even stopped there that day, and that he did not know, at the time, that Harris worked across the street. Whether Hunt stayed overnight at the inn is irrelevant; if Hunt was present

at Harris's workplace, the incident counts as an action directed at Harris regardless of how long Hunt stayed in that location. However, Hunt correctly points out that, in order for this action to be part of a "course of conduct," he must have "intentionally or knowingly" committed that action. *See id.* § 76-5-106.5(2). The district court made no specific finding about whether Hunt knew that Harris worked across the street from the inn, and it likewise made no specific finding about whether Hunt actually stopped at the inn that day; arguably, the court made at least implied findings in that regard to which we would be obligated to defer absent a showing of clear error. But even if the court failed to make appropriate findings, the inn incident was merely one of many that made up the course of conduct here, and sustaining Hunt's challenge on this single point would not change the outcome of this appeal. We therefore assume, arguendo, that the court erred by not making specific findings about this incident, but we deem any such error harmless under the circumstances. *See Hall v. Hall*, 858 P.2d 1018, 1025 (Utah Ct. App. 1993) (stating that a district court's "failure to have made the missing findings can be viewed as harmless error").

## CONCLUSION

¶18    For the foregoing reasons, the district court committed no reversible error in determining that Hunt's actions constituted a course of conduct directed at Harris, as those terms are defined in Utah's stalking statute. We therefore reject Hunt's challenge to the court's civil stalking injunction.

¶19    Affirmed.

———————