**2025 UT App 12**

# THE UTAH COURT OF APPEALS

STEPHEN EDWARD SCHMIDT,
Appellant,
*v.*
KYLE JEFFERY PETERSEN,
Appellee.

Opinion
No. 20230287-CA
Filed January 30, 2025

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
No. 220500427

Julie J. Nelson, Attorney for Appellant

Emily Adams and Melissa Jo Townsend,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1    Kyle Petersen is married to Stephen (Steve) Schmidt's ex-wife, Angela Petersen.[1] In December 2022, Steve obtained an ex parte civil stalking injunction against Kyle. Kyle later challenged that injunction. After an evidentiary hearing, the district court revoked it, concluding that Steve had not proven by a preponderance of the evidence that Kyle had engaged in the

---

1. Kyle and Angela currently share a last name, and in the briefing, both parties referred to Steve, Kyle, and Angela by their first names. We'll follow suit, with no disrespect intended by the apparent informality.

conduct in question. Steve now appeals that ruling. For the reasons set forth below, we affirm.

## BACKGROUND

¶2 Utah's civil stalking injunction statute allows a court to issue an ex parte civil stalking injunction if the court has "reason to believe that an offense of stalking has occurred." Utah Code § 78B-7-701(3)(a). If an ex parte civil stalking injunction is issued, the person against whom it was entered (the respondent) can request a hearing to challenge it. *See id.* § 78B-7-701(4)(a). At that hearing, the person requesting the injunction (the petitioner) bears the burden of "show[ing] by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred." *Id.* § 78B-7-701(4)(b)(ii); *see also id.* § 78B-7-701(5)(b). Based on its consideration of the evidence, "the court may modify, revoke, or continue the injunction." *Id.* § 78B-7-701(5)(a). If the respondent does not request a hearing, "the ex parte civil stalking injunction automatically becomes a civil stalking injunction without further notice to the respondent and expires three years after the day on which the ex parte civil stalking injunction is served." *Id.* § 78B-7-701(6)(c).

¶3 In June 2022, Steve obtained an ex parte civil stalking injunction against Kyle, but the district court later revoked it. In December 2022, Steve obtained another ex parte civil stalking injunction against Kyle, but the district court revoked that injunction as well. This appeal is from the court's decision to revoke the December 2022 injunction. Because the issues on appeal also implicate the June 2022 injunction, we'll recount the relevant details from both cases.

### *June 2022 Injunction*

¶4 Steve and Angela were married for 16 years, but they divorced in December 2018. Steve and Angela's divorce was

"contentious," and they were still litigating custody issues involving their children in the summer of 2022.

¶5      In June 2022, Angela married Kyle. On the weekend of Angela and Kyle's wedding, Steve and Kyle had an ill-tempered text exchange. In one of his texts to Steve, Kyle attached a photo that showed the back of Steve's car with a Confederate flag sticker on the bumper, with the apparent implication being that Kyle could embarrass Steve publicly. This concerned Steve because (1) the photo of his car appeared to have been taken from within his gated community, so whoever took the photo had somehow gotten inside, and (2) he did not have a Confederate flag sticker on his car, so he believed that Kyle had added that image digitally.

¶6      Based on these texts, Steve sought and obtained an ex parte civil stalking injunction against Kyle. Pursuant to his rights under the statute, Kyle requested a hearing to challenge the injunction. Steve testified at the subsequent hearing, and in his testimony, he admitted that he did not know if Kyle was the person who either took the photo in question or digitally altered it. As to the question of who altered the photo, Steve stated that there were a "multitude of possibilities" as to how that may have occurred. And as to the question of who took the photo, Kyle's counsel pointed out in argument that the registration sticker on the license plate in the photo listed September 2020 as the expiration date, thus suggesting that the photo had been taken long before Kyle sent the text to Steve in June 2022.

¶7      At the close of the hearing, the district court found that although there was no dispute that Kyle had sent the underlying texts to Steve, there was insufficient proof that Kyle was the person who took the photo of Steve's car. From this, it likewise concluded that there was insufficient proof that Kyle was surveilling Steve or entering his gated community uninvited. And without proof that Kyle had taken the photo, the court ruled that the texts themselves were not "sufficient to cause a reasonable

person to suffer significant mental or psychological suffering when the court consider[ed] the context of the communications." The court thus concluded that the statutory standard had not been satisfied, and it revoked the ex parte civil stalking injunction as a result.[2]

*December 2022 Injunction*

¶8      In December 2022, Steve's personal assistant (Assistant) learned that someone had set up a credit monitoring account (the Credit Monitoring Account) in Steve's name without his authorization. With the help of Assistant, Steve learned that the Credit Monitoring Account was registered to an email address that mimicked his work email, and he also learned that whoever created the Credit Monitoring Account had known and used his social security number and his birthdate. Steve further learned that (1) the Credit Monitoring Account was linked to a phone number that appeared to match Angela's phone number (though only the last four digits of the number were visible), and (2) it had been paid for since February 2021 with monthly charges of $9.95 to a credit card that was registered to "Kyle Petersen."

¶9      Steve believed that Kyle was behind the Credit Monitoring Account, so later that month, Steve requested a new ex parte civil stalking injunction against Kyle. In this petition, Steve argued that Kyle had stolen "personal and sensitive information to impersonate Steve and to incessantly surveil and monitor his financial and credit information for months on end to facilitate his stalking." Steve also argued that Kyle's conduct would "cause emotional distress to anyone in Steve's shoes." Steve's petition

---

2. In its ruling, the court did not address the question of whether there was sufficient evidence to show that Kyle had altered the photo to add the Confederate flag sticker. But as indicated, Steve testified at the hearing that he did not know if Kyle was the person who digitally altered the photo.

also included materials from the June 2022 case, including the old petition, Steve's prior affidavit, screenshots of some of the text messages, and a transcript from the hearing.

¶10    The court issued an ex parte civil stalking injunction against Kyle. After being served, Kyle requested a hearing to challenge it. At the subsequent evidentiary hearing, the parties appeared before the same judge who had revoked the June 2022 stalking injunction, and Steve called Assistant and himself as witnesses.

¶11    In her testimony, Assistant recounted how she discovered the Credit Monitoring Account, as well as how she learned the details recounted above—including that the Credit Monitoring Account was linked to a phone number that seemed to match Angela's phone number, that it was being paid for by a credit card with Kyle's name on it, and that whoever set the account up had known Steve's birthdate and social security number. On cross-examination from Kyle's counsel, Assistant admitted that the only "information that was linked to [Kyle] was the use of his [credit] card."

¶12    In his testimony, Steve briefly recounted the circumstances and text messages that led to the June 2022 ex parte civil stalking injunction, stating that Kyle had "affixed a hate emblem onto [his] automobile apparently through computer manipulation and had threatened to make public disclosures, made threats to embarrass [him] with that." He also acknowledged that the prior ex parte injunction was eventually revoked.

¶13    Turning to the new request, Steve testified that when he learned about the Credit Monitoring Account, it put him into a "state of panic." Steve also testified that Kyle had previously made a comment to Steve's son about Steve's finances that essentially suggested that Steve was going bankrupt, which Steve now believed showed that Kyle had been "illegally looking at" Steve's finances with information gleaned from the Credit

Monitoring Account. During cross-examination, however, Steve admitted that Angela knew his social security number and birthdate. And Steve also admitted that on two occasions during their marriage, Angela had "improperly used" his social security number to "access loans."

¶14 At the outset of the defense's case-in-chief, Kyle's counsel tried to admit a declaration from Angela that had been submitted before the hearing, but the court excluded the declaration under the hearsay rule. When Angela then took the stand and began testifying, the court interjected and advised her of the possibility that her testimony might expose her to criminal liability, and the hearing was continued to allow her to consult with counsel. When the hearing reconvened, the court was informed that Angela would not be testifying further.

¶15 Kyle's counsel then recalled Steve to the stand. During Steve's testimony, he acknowledged that Angela had used his credit card during their marriage and that she sometimes did so without his knowledge. Kyle's counsel also asked Steve if he had any evidence besides the credit card that linked Kyle to the Credit Monitoring Account. Steve responded that he did not. Kyle did not testify in his own defense.

¶16 During closing arguments, the district court engaged in discussions with the attorneys from both sides. The court asked Steve's counsel what evidence showed that Kyle "knowingly or intentionally engaged in this course of conduct." Steve's counsel responded that it was reasonable to assume that Kyle would not have failed to miss a "reoccurring charge for two years" and that his alleged knowledge of the credit card charges, in combination with the "evidence that he was talking to [Steve] specifically about financial matters" from the prior stalking injunction, was enough to show that he'd engaged in a course of conduct directed at Steve as required to support a civil stalking injunction. Steve's counsel also made a point of referencing the June 2022 injunction, arguing

that the court needed to consider "the totality of the circumstances" and not consider the matter in a "vacuum" when deciding whether to continue the December 2022 ex parte injunction.

¶17 The court also asked Kyle's counsel why it "should or shouldn't . . . make the finding that [Kyle] knowingly or intentionally engaged in this course of conduct." Kyle's counsel responded that there had been no evidence that Kyle actively managed his credit card, suggesting that in some relationships, one spouse or the other handles such things. Kyle's counsel further argued that, given how the charge might have appeared on the credit card statements, Kyle may have thought the charge was for something else (such as credit monitoring for himself). Kyle's counsel thus suggested that on the state of the evidence, there was nothing that "tip[ped] the scale" showing that it was "more likely than not that Kyle was directly involved."

¶18 After the parties had presented their oral arguments, the district court announced its ruling from the bench. After laying out the standard for a civil stalking injunction, the court ruled as follows:

> Here, we had a course of conduct in terms of multiple months of surreptitious monitoring of [Steve's] credit report. It is directed at a specific person, [Steve]. Whoever did it knew or should know, objectively, that that conduct would cause a reasonable person in [Steve's] situation, in any person's situation, to either fear for their own safety, based upon being surreptitiously surveilled with respect to their sensitive financial information, or to suffer other emotional distress, as that phrase is used and defined in the statute.
>
> Here, the issue, the fulcrum upon which the determination in this case balances is whether

[Steve] has shown by a preponderance of the evidence that [Kyle] is the person who intentionally or knowingly engaged in this course of conduct.

Evidence weighing in favor of that finding is the fact that [Kyle's] credit card number is the credit card number associated with the [Credit Monitoring Account] that was opened to surreptitiously surveil [Steve's] credit account.

But on the other hand, we have [Angela's] . . . phone number attached to that account. We don't have any testimony that [Kyle] actually set that account up. We do have circumstantial evidence that Angela has previously used [Steve's] credit card number without his knowledge during their marriage. And we don't have any sworn testimony from [Kyle] or from Angela.

Given the limited evidentiary record currently before the Court and without making any predictions about how this issue would turn out given a more robust evidentiary record, the Court finds that [Steve] has failed to carry his burden by a preponderance of the evidence to show that it was [Kyle] who engaged intentionally or knowingly in the course of conduct that [led] to his credit report being surreptitiously reviewed and surveilled through the [Credit Monitoring Account].

The Court is persuaded by [Kyle's] counsel's argument that, at best, the . . . evidence is evenly balanced, that it was either [Kyle] or his wife that did this, and evenly balanced is not sufficient to carry the burden under a preponderance of the evidence standard.

¶19 The court later issued a written order revoking the ex parte civil stalking injunction. In the oral ruling and the written order, the court made no mention of Kyle's alleged prior conduct that had formed the basis for the June 2022 ex parte civil stalking injunction.

## ISSUES AND STANDARDS OF REVIEW

¶20 Steve appeals the district court's revocation of the December 2022 ex parte civil stalking injunction, arguing that the court erred in two respects. First, Steve argues that the court erred when it concluded that Steve had not carried his burden of proving that Kyle had engaged in a course of conduct directed at Steve. "When reviewing a bench trial for sufficiency of the evidence, we must sustain the district court's judgment unless it is against the clear weight of the evidence." *In re Estate of Wright*, 2024 UT App 146, ¶ 22, 559 P.3d 966 (quotation simplified). "We will not second guess a court's decision about evidentiary weight and credibility if there is a reasonable basis in the record to support them." *Id.* (quotation simplified).

¶21 Second, Steve argues that in assessing the evidentiary picture, the court failed to consider Kyle's cumulative conduct, which he regards as a statutory requirement. "The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusion." *Baird v. Baird*, 2014 UT 08, ¶ 16, 322 P.3d 728 (quotation simplified).

## ANALYSIS

### I. Weight of the Evidence

¶22 The district court concluded that Steve had not "carr[ied] the burden" of showing, by a preponderance of the evidence, that

he was entitled to a civil stalking injunction. On appeal, Steve argues that this conclusion "was against the weight of the evidence." In his view, the court erroneously "disregard[ed] evidence of Kyle's involvement in the credit monitoring scheme" and should have found that Kyle was "involve[d] in the credit monitoring scheme." We see no basis for reversing the court's determination.

¶23    As explained above in the Background, Utah's civil stalking injunction statute allows a court to issue an ex parte civil stalking injunction if the court has "reason to believe that an offense of stalking has occurred." Utah Code § 78B-7-701(3)(a). If an ex parte civil stalking injunction is issued, the respondent can request a hearing to challenge it. *See id.* § 78B-7-701(4)(a).

¶24    At the time of the hearing in this case (as well as at the time of the conduct in question), the Utah Code required a petitioner to establish two elements.[3] First, the petitioner was required to show that the respondent "intentionally or knowingly engage[d] in a course of conduct directed at" the petitioner; and second, the petitioner was required to show that the respondent knew or should have known "that the course of conduct would cause a reasonable person to fear for the person's own safety or suffer

---

3. We've previously noted that "the stalking injunction statute borrows its definition from the criminal stalking statute. In other words, to obtain a civil stalking injunction, a petitioner must establish the elements necessary to meet the definition of stalking in the criminal code." *Anderson v. Deem*, 2023 UT App 48, ¶ 23 n.6, 530 P.3d 945 (quotation simplified); *see also* Utah Code § 78B-7-102(22) (stating that for purposes of the civil stalking statute, "'stalking' means the same as that term is defined in Section 76-5-106.5").

other emotional distress."[4] *Ragsdale v. Fishler*, 2021 UT 29, ¶ 25, 491 P.3d 835 (quotation simplified); *see also* Utah Code § 76-5-106.5(2)(a) (2022); *Anderson v. Deem*, 2023 UT App 48, ¶ 24, 530 P.3d 945. "A district court may enjoin an alleged stalker only if both elements are met." *Ragsdale*, 2021 UT 29, ¶ 25.

¶25 In establishing both elements, the petitioner bore (and still bears under the current statute) the burden of "show[ing] by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred." Utah Code § 78B-7-701(4)(b)(ii); *see also id.* § 78B-7-701(5)(b). Thus, as the petitioner here, Steve was required to demonstrate that it was more likely than not that Kyle had stalked Steve. *See V.M. v. Division of Child & Family Services*, 2020 UT App 35, ¶ 21, 461 P.3d 326 (defining the preponderance of the evidence standard). And in determining whether he had carried this burden, the district court had "considerable discretion to assign relative weight to the evidence before it. This discretion include[d] the right to minimize or even disregard certain evidence." *Poll v. Poll*, 2011 UT App 307, ¶ 9, 263 P.3d 534 (quotation simplified). In reviewing such a decision, "we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable." *Hoffman v. Labor Comm'n*, 2023 UT App 96, ¶ 21, 536 P.3d 143 (quotation simplified). "Instead, we defer to a lower tribunal's findings because when reasonably conflicting views arise, it is the fact-finder's province to draw inferences and resolve these conflicts." *Becker v. Sunset City*, 2013 UT 51, ¶ 21, 309 P.3d 223 (quotation simplified). We do not disturb the weighing of the district court "absent a showing that the trial

---

4. For clarity in future cases, we note that the legislature amended the statute in 2024 to now state that an "actor commits stalking" when the actor "knows or is reckless" as to whether the course of conduct would cause a reasonable person to fear for the individual's own safety or the safety of a third individual or suffer other emotional distress. Utah Code § 76-5-106.5(2)(a) (2024).

court's findings lack evidentiary support." *High Desert Estates LLC v. Arnett*, 2015 UT App 196, ¶ 12, 357 P.3d 7.

¶26    In its ruling, the court noted that the only information that linked Kyle to the alleged conduct was that the Credit Monitoring Account's billing information was linked to Kyle's credit card. And there was ample support for this conclusion. After all, Steve and Assistant both admitted at the hearing that this was indeed the only evidence that they were aware of linking Kyle to the Credit Monitoring Account.

¶27    We recognize that this was at least some evidence from which the court could have concluded that Kyle was involved with this account. But as the court also pointed out, there was evidence before it suggesting that it was Angela who was behind the Credit Monitoring Account, not Kyle. This included the following:

- The Credit Monitoring Account was linked to Angela's phone number, not Kyle's.

- Steve conceded that Angela knew his birthdate and social security number, which was the private information that was used to open the Credit Monitoring Account.

- Steve admitted that Angela had previously used his social security number to access loans, and he further admitted that she had previously used his credit card without his knowledge too.

- Angela had her own personal motivations for surveilling Steve—the two had a contentious divorce, and they were still litigating custody issues involving their children.

In light of all this, the court concluded that Steve had "failed to carry his burden by a preponderance of the evidence to show that it was [Kyle] who engaged intentionally or knowingly in the

course of conduct that [led] to his credit report being surreptitiously reviewed and surveilled through the [Credit Monitoring Account]."

¶28 Steve nevertheless faults the district court's weighing of the evidence. Steve initially argues that because the evidence showed that Kyle's credit card had been billed for over 20 monthly payments, it would simply be unreasonable for the court to conclude that he wasn't involved with the Credit Monitoring Account. But as the district court pointed out, there was no "sworn testimony from [Kyle] or from Angela." As a result, there was no evidentiary basis from which to draw specific inferences about how Kyle managed his finances generally or how often he looked at his credit card statements more particularly. We also note that the amount in question ($9.95 per month) would not be so large that a person in Kyle's shoes couldn't overlook it. And moreover, as pointed out by Kyle's counsel, it was unclear from this record whether a charge of that sort (for a credit monitoring service) would have triggered Kyle's suspicions, given the possibility that he might have thought that this charge was for something that benefited him.

¶29 Steve also argues that when the district court observed that the "evidence [was] evenly balanced, that it was either [Kyle] or his wife that did this, and evenly balanced is not sufficient to carry the burden under a preponderance of the evidence standard," the district court improperly treated this as an either/or proposition. In Steve's view, the court's ruling was based on the "faulty assumption that only one person could be responsible for the credit monitoring scheme." We take the point—it could well have been the case that Angela and Kyle were both responsible for the Credit Monitoring Account. But even so, we decline the invitation to focus in so narrowly on this one phrase that we lose sight of the court's broader ruling. In its discussion with the attorneys during closing arguments, the district court observed that the question before it was whether there was "an evidentiary basis to make a

finding that [Kyle] knowingly or intentionally engaged in" the credit monitoring conduct. And elsewhere in its ruling, the court said that the "fulcrum" of its decision was whether there was sufficient evidence to show that "Kyle Petersen is the person who intentionally or knowingly engaged in this course of conduct." On balance, it seems clear enough from the court's comments as a whole that the court was aware of the question that was before it—namely, whether Kyle was involved. And as discussed, the court ultimately and specifically concluded that there was not a preponderance of the evidence showing that he was.

¶30     Finally, Steve argues that the district court should have drawn adverse inferences against Kyle based on his lack of testimony. But Steve had the burden of proof, not Kyle, and Steve never subpoenaed Kyle to testify. Steve points to no authority suggesting that a court even can, much less must, draw an adverse inference against a defendant in a civil case if the defendant is not subpoenaed and doesn't choose to testify.

¶31     In short, we agree with Steve that there was some evidence suggesting that Kyle was involved. But as the district court pointed out, Steve had the burden of proving his case by a preponderance of the evidence, and there was also evidence suggesting that it was Angela who created and maintained the Credit Monitoring Account. From its vantage point, the district court concluded that the preponderance of the evidence did not show that Kyle was involved. We accordingly "defer" to its findings because it was the "province" of the district court "to draw inferences and resolve these conflicts." *Becker*, 2013 UT 51, ¶ 21 (quotation simplified).

## II. Consideration of Prior Conduct

¶32     Steve also argues that the district court erred by failing to consider one additional piece of evidence—namely, what Steve now refers to as "Kyle's undisputed past conduct" from the June 2022 case. In Steve's view, when determining whether a petitioner

has carried his or her burden under the civil stalking statute, a district court must "consider the respondent's full course of conduct," and Steve argues that the district court therefore erred here because it "did not consider Kyle's previous conduct as part of its analysis." Steve contends that if this conduct had been added to the mix, the court would have reached a different conclusion.

¶33 As an initial matter, we recognize, as we have in prior cases, that "when determining whether a person's acts constitute a course of conduct, our cases require that we consider the acts cumulatively in light of all the facts and circumstances." *Richins v. Weldon*, 2023 UT App 147, ¶¶ 53, 59, 541 P.3d 274; *see also Ellison v. Stam*, 2006 UT App 150, ¶ 38, 136 P.3d 1242 ("The failure to analyze the entire course of conduct between the parties is also inappropriate in determining whether [the respondent's] conduct was directed at [the petitioner]."(quotation simplified)), *abrogated on other grounds by Harris v. Hunt*, 2024 UT App 117, 557 P.3d 228. And this same cumulative review requirement likewise applies when determining whether "the respondent's conduct would cause emotional distress to a reasonable person in the petitioner's circumstances." *Baird v. Baird*, 2014 UT 08, ¶ 25, 322 P.3d 728; s*ee also Anderson*, 2023 UT App 48, ¶ 30 (faulting a district court for "using an insular rather than a holistic framework to arrive at its conclusion that [the respondent's] course of conduct was not of such a type as to cause fear or emotional distress to a reasonable person").

¶34 But as noted, the district court didn't revoke the ex parte injunction based on Steve's failure to satisfy either the course of conduct element or the fear or emotional distress element. Instead, the district court revoked the injunction based on its conclusion that Steve had failed to show that Kyle even committed these particular acts at all. Reviewing the cases, it's a touch unclear to us whether the cumulative analysis requirement applies to that initial step, or whether applying that requirement

to that question would be problematic under anti-propensity principles that hold some sway in certain areas of our law.

¶35   In any event, even if the cumulative analysis requirement does apply to this initial question, there's some reason to think that the court complied with the obligation here. After all, Steve's petition in this case included materials from the June 2022 case, including the old petition, Steve's prior affidavit, screenshots of some of the text messages, and a transcript from the hearing. During closing arguments, Steve's counsel made a point of referencing the prior ex parte injunction, arguing that the court needed to consider "the totality of the circumstances" and that it should not consider the latest conduct in a "vacuum." And while it's true that the district court did not expressly refer to the past conduct in its oral ruling or the ultimate order, our supreme court has "occasionally endorsed the propriety of a regime" in which an appellate court may "assume that the trier of facts found facts in accord with its decision despite the absence of express findings of fact." *State v. Stewart*, 2019 UT 39, ¶ 27, 449 P.3d 59 (quotation simplified).

¶36   Regardless, we need not definitively answer these questions in this case. This is so because Steve has not persuaded us that, even if the district court did not consider the conduct from the June 2022 incident in its analysis, and even if it was indeed required to do so, Steve was prejudiced by this failure.

¶37   Steve has not argued that a court's failure to comply with the cumulative analysis requirement constitutes structural error—i.e., the kind of error for which a party need not establish prejudice. *See State v. Reece*, 2015 UT 45, ¶ 34, 349 P.3d 712. And in past cases, we have held that a district court's failure to make findings to support a stalking injunction can constitute harmless error. *See, e.g.*, *Harris v. Hunt*, 2024 UT App 117, ¶ 17, 557 P.3d 228. Under "well-accepted harmless error standards, we don't reverse rulings unless there is a reasonable likelihood that the error

affected the outcome of the proceedings." *Capozzoli v. Madden*, 2024 UT App 176, ¶ 33, -- P.3d -- (quotation simplified).

¶38    Again, Steve's argument is that the court should have considered "Kyle's undisputed past conduct" from the June 2022 incident as part of its analysis with respect to the December 2022 injunction. But as noted, Steve presented no evidence at the hearing in the prior case that Kyle was the person who altered the photo that Kyle had texted, and Steve even admitted at the prior hearing that he did not have any such evidence. The court also ruled in the prior case that there was insufficient evidence to conclude that Kyle had taken the photo in question. As a result, the only "undisputed past conduct" at issue would have been the intemperate text exchange itself (including, of course, Kyle's decision to send the photo).

¶39    As discussed, the court's evaluation of the evidence in this case largely turned on three realities: (1) the only evidence linking Kyle to the Credit Monitoring Account was the fact that his credit card was associated with it, but (2) there was evidence directly linking it to Angela (namely, her phone number), and (3) there was also evidence before the court that Angela had improperly used Steve's personal and financial information in the past. What the intemperate texts would have added to the mix is some proof that Kyle and Steve had a combative relationship. But this would not have been surprising information—after all, Steve was engaged in an ongoing and contentious court battle with Angela, whom Kyle had married on the very weekend in which he sent these texts. And of some note, the Credit Monitoring Account was set up in February 2021, but the texts in question were sent in June 2022. Given that the texts were sent 16 months after the account was set up, it's unclear how much relevance they really had to the question of whether Kyle was involved in setting up or maintaining the account. Finally, as Kyle argues on appeal, there is something of a conceptual gap between a person being willing to send angry texts to another and a person being willing to

surreptitiously set up a credit monitoring account in the other person's name, an act that could expose that person to civil or even criminal liability.

¶40   To be clear, we do recognize that these texts could have had some evidentiary value in terms of showing Kyle's animus toward Steve. But in light of the evidence already before the court, the timing gap between the creation of the Credit Monitoring Account and the texts, the differences in terms of the kind of conduct at issue, and the other more direct evidence regarding Angela's link to this account and her similar kinds of behavior in the past, we're not persuaded that there is a reasonable probability that, if the court had added these texts to the evidentiary mix in the December 2022 case, it would have concluded that Steve had proven his case by a preponderance of the evidence. As a result, we're not persuaded that the alleged error prejudiced Steve. We therefore reject the invitation to overturn the court's weighing of the evidence on this basis.

## CONCLUSION

¶41   For the reasons set forth above, we affirm the district court's decision to revoke the ex parte civil stalking injunction.

_____