*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 26**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JORGE ARMENTA,
*Appellant,*

*v.*

UNIFIED FIRE AUTHORITY,
*Appellee.*

No. 20240540
Heard May 13, 2025
Filed August 7, 2025

On Direct Appeal

Third District Court, Salt Lake County
The Honorable Coral Sanchez
No. 220906811

Attorneys:

Terence L. Rooney, J. Adam Sorenson, Salt Lake City,
for appellant

Andrew L. Roth, Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the
Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN,
JUSTICE HAGEN, and JUSTICE POHLMAN joined.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 Jorge Armenta sought medical attention after he experienced shortness of breath and chest pain. Unified Fire Authority (UFA) emergency medical technicians (EMTs) responded to the 911 call. They evaluated Armenta and told him everything looked normal. One week later, Armenta found himself in the emergency room, suffering a heart attack. Armenta sued

UFA, arguing that its failure to properly diagnose him caused him injuries.

¶2    UFA, a governmental entity, moved to dismiss. It argued that the Utah Governmental Immunity Act (UGIA) shielded it from suit. The district court granted the motion and held that UFA retained governmental immunity for "the activity of . . . providing emergency medical assistance." *See* UTAH CODE § 63G-7-201(4)(s)(i). The court also determined that this application of the UGIA did not violate the Utah Constitution's Open Courts Clause.

¶3    Armenta contends that the district court erred in both determinations. Because we conclude that the UGIA provides no immunity to UFA in this instance, we need not reach the constitutional question. We reverse the district court's grant of UFA's motion to dismiss and remand.

## BACKGROUND[1]

¶4    One November day, Armenta experienced shortness of breath and chest pain after attending an exercise class. He lost consciousness, and his wife called 911. UFA EMTs responded to the call and, after evaluating Armenta, told him that "everything looked normal" and "a trip to the emergency room was unnecessary." The EMTs assumed Armenta had experienced an anxiety attack and recommended that he talk to his doctor about managing stress.

¶5    Armenta's condition continued to worsen, landing him in the emergency room one week later—pale, sweaty, and barely able to walk. There, staff told him that he was "having a massive heart attack." During surgery, doctors "found a 100% blockage of Armenta's right coronary artery." Armenta believes that his injuries "will likely lead to heart failure and early death" unless he undergoes a heart transplant.

¶6    Armenta sued UFA for negligence. He alleges that "the damage to his heart and the shortening of his life" would have been

---

[1] "On appeal from a motion to dismiss, we review the facts only as they are alleged in the complaint. We accept the factual allegations as true and draw all reasonable inferences from those facts in a light most favorable to the plaintiff." *Gregory v. Shurtleff*, 2013 UT 18, ¶ 8, 299 P.3d 1098 (cleaned up). We stress that the allegations we recite here have yet to be tested.

avoided if UFA had "properly and timely diagnosed and cared for him." Armenta contends that UFA breached its duties of care by, among other things, misdiagnosing him.[2]

¶7   UFA moved to dismiss Armenta's complaint. It argued that the UGIA provided it immunity from suit. Utah Code subsection 63G-7-201(4)(s)(i) directs that a governmental entity is "immune from suit, and immunity is not waived, for any injury proximately caused by a negligent act or omission . . . , if the injury arises out of or in connection with, or results from: . . . providing emergency medical assistance."

¶8   The district court applied a three-part test to determine whether UFA could claim immunity under the UGIA. The court evaluated "(1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver." (Quoting *Van de Grift v. State*, 2013 UT 11, ¶ 8, 299 P.3d 1043.)

¶9   The court first concluded that "responding to a 911 call and providing emergency ambulance medical services" was a "governmental function." The court next determined that the government waived immunity for that activity. (Citing UTAH CODE § 63G-7-301(2)(i).) And it concluded that the UGIA contained an exception to the waiver that restored immunity: "the activity of . . . providing emergency medical assistance." *See* UTAH CODE § 63G-7-201(4)(s)(i).[3]

¶10 The court granted UFA's motion and entered judgment under rule 54(b) of the Utah Rules of Civil Procedure, dismissing UFA from the case. *See* UTAH R. CIV. P. 54(b) (allowing a court to

---

[2] Armenta also sued the Foothill Clinic, LLC (dba Foothill Family Clinic) and a physician assistant he had consulted at that practice, alleging the same claims against them. Armenta's claims against these defendants are not relevant to this appeal.

[3] The court also considered and rejected Armenta's argument that this application of the UGIA violates the Utah Constitution's Open Courts Clause. Because we conclude that the UGIA does not extend immunity to UFA in this circumstance, we do not reach the merits of that decision.

"enter judgment as to one or more but fewer than all of the claims or parties"). Armenta appeals.

## ISSUE AND STANDARD OF REVIEW

¶11  Armenta contends that the district court erred when it granted UFA's motion to dismiss. A "district court's dismissal of a complaint under rule 12(b)(6) of the Utah Rules of Civil Procedure" and its interpretation of a statute are legal questions that we review for correctness. *Phillips v. Henderson*, 2024 UT 19, ¶ 6, 552 P.3d 195; *Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 7, 284 P.3d 600.

## ANALYSIS

¶12  The UGIA protects governmental entities and employees from some lawsuits for torts committed within the scope of their employment. *See generally* UTAH CODE §§ 63G-7-101 to -904. That immunity is retained "unless [it] has been expressly waived." *Id.* § 63G-7-101(3). But "even if immunity from suit for the injury is waived," immunity is retained if the "injury arises out of or in connection with, or results from" certain conduct or conditions. *Id.* § 63G-7-101(4).

¶13  The State of Utah waives "[i]mmunity from suit . . . as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment." *Id.* § 63G-7-301(2)(i). But that waiver is subject to exceptions. Relevant here, "immunity is not waived[] for any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment, if the injury arises out of or in connection with, or results from: . . . the activity of: (i) providing emergency medical assistance." *Id.* § 63G-7-201(4)(s)(i).

¶14  "Generally, to determine whether a governmental entity is immune from suit under the [UGIA], [Utah courts] apply a three-part test . . . ." *Van de Grift v. State*, 2013 UT 11, ¶ 8, 299 P.3d 1043 (cleaned up); *see also Mariani v. Utah Dep't of Pub. Safety-Driver License Div.*, 2024 UT 44, ¶ 17, 562 P.3d 697 (affirming our traditional "three-part method" even considering the UGIA's more recent revisions). Courts assess "(1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver." *Van de Grift*, 2013 UT 11, ¶ 8 (cleaned up).

¶15 The district court applied the test and held that: "responding to a 911 call and providing emergency ambulance

medical services" is a "governmental function" under the UGIA;[4] immunity is waived for UFA's activity; and UFA's activity falls within the UGIA's "providing emergency medical assistance" exception.

¶16 The court acknowledged that the UGIA does not define "emergency medical assistance." So the court parsed that phrase's "terms and combin[ed] the meanings of those terms into a cohesive whole." The court relied on dictionary definitions to conclude that the ordinary meaning of "emergency medical assistance" was "any medical treatment provided in response to an urgent need for relief or help." The district court reasoned that the conduct at the center of Armenta's complaint was exactly that, leading the court to conclude that UFA was immune from suit for that activity.

¶17 Armenta contends that the district court erred because UFA's response to a 911 call does not fall within the "providing emergency medical assistance" exception to the immunity waiver.

¶18 Armenta raises a question of statutory interpretation. Our primary goal when trying to wring the meaning out of statutory language "is to evince the true intent and purpose of the Legislature." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (cleaned up). "The best evidence of the legislature's intent is the plain language of the statute itself." *Id.* (cleaned up). In some cases, "statutory text may not be 'plain' when read in isolation, but may become so in light of its linguistic, structural, and statutory context." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465.

¶19 If a statute's meaning can be discerned from its language, we don't go looking for non-textual interpretive tools to use. *See Marion Energy*, 2011 UT 50, ¶ 15. "[W]e generally resort to non-textual sources of meaning when the text, and textual tools of interpretation, have failed to yield an answer." *Midwest Fam. Mut.*

---

[4] The UGIA defines "governmental function" as meaning "each activity, undertaking, or operation of a governmental entity" and including "each activity, undertaking, or operation performed by a department, agency, employee, agent, or officer of a governmental entity," as well as "a governmental entity's failure to act." UTAH CODE § 63G-7-102(5). Armenta, at least for the purpose of this appeal, does not contest that UFA's activity qualifies as a governmental function within this definition.

*Ins. v. Hinton*, 2025 UT 4, ¶ 60 n.11, 567 P.3d 524. That is, "when statutory language is ambiguous—in that its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis—," *Marion Energy*, 2011 UT 50, ¶ 15, we "seek guidance from legislative history and relevant policy considerations," *Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶ 31, 506 P.3d 509 (cleaned up).

¶20 Armenta first contends that the district court based its interpretation on a flawed definition of "emergency medical assistance." UFA disagrees, maintaining instead that the "district court undertook its plain-language analysis just as . . . [this court] ha[s] instructed—using the dictionary as a 'starting point' to assess the ordinary meaning of an undefined statutory phrase."

¶21 Because the UGIA does not define "emergency medical assistance," and because no Utah court has interpreted the phrase in the context of the UGIA, the district court looked first to a dictionary to determine the ordinary meaning. The district court took the Black's Law Dictionary definitions of "emergency," "medical examination," and "assistance," and stitched together an interpretation. The district court opined that emergency medical assistance means "any medical treatment provided in response to an urgent need for relief or help." The court explained, "Combining the meaning of [the relevant] terms into a cohesive whole, UFA's allege[d] conduct of responding to a 911 call, providing emergency ambulance services, and assessing, diagnosing, and triaging Plaintiff's emergent medical condition, amount to 'emergency medical assistance.'"

¶22 We agree with Armenta that combining the dictionary definitions of the individual words in this provision did not result in a correct interpretation of the statute. The court's interpretation rested on "the hyperliteral meaning of each word in the text." *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 356 (2012). Such an interpretation risks "los[ing] sight of the forest for the trees." *See id.* (cleaned up).

¶23 We have similarly observed that dictionaries, while often helpful, are not always the alpha and omega of the search for statutory meaning. Indeed, we have opined that "the dictionary alone is often inadequate to the task of [statutory] interpretation because different definitions may support different interpretations." *GeoMetWatch Corp. v. Utah State Univ. Rsch. Found.*, 2018 UT 50, ¶ 21, 428 P.3d 1064 (cleaned up).

¶24 Here, for instance, the dictionary on which the district court relied includes two definitions of "emergency." The first is "[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm." *Emergency*, BLACK'S LAW DICTIONARY (11th ed. 2019). And the second is "[a]n urgent need for relief or help." *Id.* The district court seemed to favor the second definition and that colored the way the court interpreted the pertinent language.

¶25 But, from this dictionary alone, we cannot be sure that the Legislature did not have another definition of emergency in mind. For example, the Legislature could have intended "emergency medical assistance" to mean any medical assistance provided in response to "an exigent circumstance in which immediate assistance is needed . . . to lessen or avert the threat of *disaster*." *Emergency*, BLACK'S LAW DICTIONARY (12th ed. 2024) (Emphasis added).[5]

---

[5] The Legislature could also have intended "emergency" to mean "something dangerous or serious, such as an accident, that happens suddenly or unexpectedly and needs fast action in order to avoid harmful results," *Emergency*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/emergency (last visited July 30, 2025) (listing as synonyms "catastrophe," "crisis," "disaster," and "calamity"), "an exigency," *Emergency*, LEGAL INFO. INST., https://www.law.cornell.edu/wex/emergency (last visited July 30, 2025), "a sudden, generally unexpected occurrence or set of circumstances demanding immediate action," *Emergency*, COLLINS DICTIONARY, https://www.collinsdictionary.com/us/dictionary/english/emergency (last visited July 30, 2025), or "[a]ny incident, whether natural, technological, or human-caused, that necessitates responsive action to protect life, property, critical infrastructure, or environment," *Emergency*, U.S. DEP'T OF ENERGY, https://www.directives.doe.gov/terms_definitions/emergency (last visited July 30, 2025). While an "emergency" could mean a routine event that local emergency medical service personnel handle day to day, it can also mean a "[m]ajor fire[]," a "disaster[]," *Emergency Definition and explanation*, SAFEREACH, https://safereach.com/en/glossary/emergency-definition/ (last visited July 30, 2025), a "[h]azardous [m]aterials [a]ccident[]," or a severe-weather incident, *Types of Emergencies*, PURDUE UNIV., https://www.purdue.edu/ehps/emergency-preparedness/emer

(continued . . .)

¶26 "[T]he dictionary alone is often inadequate to the task of interpretation" for an additional reason. *GeoMetWatch*, 2018 UT 50, ¶ 21 (cleaned up). We do not interpret terms "in isolation." *See Olsen*, 2011 UT 10, ¶ 9. "Our task, instead, is to determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)." *Id.* ¶ 12; *see also* SCALIA & GARNER, *supra*, at 356 (explaining that the "full body of a text [often] contains implications that can alter the literal meaning of individual words"). The district court correctly used the dictionary as a starting point, but its analysis ended where it began. By failing to look at the statute in context, the court settled on an erroneous interpretation.

¶27 Armenta argues that we should glean meaning from the other exceptions Utah Code subsection 63G-7-201(4)(s) contains. That subsection excepts from the government's waiver of immunity

> the activity of:
>
> (i) providing emergency medical assistance;
>
> (ii) fighting fire;
>
> (iii) regulating, mitigating, or handling hazardous materials or hazardous wastes;
>
> (iv) an emergency evacuation;
>
> (v) transporting or removing an injured person to a place where emergency medical assistance can be rendered or where the person can be transported by a licensed ambulance service; or
>
> (vi) intervening during a dam emergency[.]

UTAH CODE § 63G-7-201(4)(s).

¶28 Armenta posits that the exceptions listed in subsections (s)(ii)–(iv) and (vi) are "specific and clear[,] . . . describ[ing] responses to catastrophic disasters that admittedly have historically been the purpose of governments." This resembles one of the definitions in a more recent edition of Black's Law Dictionary than the one the district court used: "an exigent circumstance in

_____

gency-preparedness/types-of-emergencies.php (last visited July 30, 2025).

which immediate assistance is needed to protect property, public health, or safety, or to lessen or avert the threat of disaster." *Emergency*, BLACK'S LAW DICTIONARY (12th ed. 2024).

¶29 Armenta's argument evokes the interpretive canon "*noscitur a sociis*, which means 'it is known from its associates.'" *Rosser v. Rosser*, 2021 UT 71, ¶ 51 n.9, 502 P.3d 294 (quoting *Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 10 n.5, 284 P.3d 600). Under this canon, "if two or more words are grouped together in a statute, the meaning of a particular word may be determined by reference to the meaning of the words surrounding it." 82 C.J.S. *Statutes* § 422 (May 2025 update); *see also Rosser*, 2021 UT 71, ¶ 51. Absent a contrary textual indication, we presume that when the Legislature groups certain words or terms together, it has some sort of commonality in mind that motivated the grouping. And we postulate that if we can identify the correct commonality, we can define an uncertain term with reference to the common thread.

¶30 When we study the activities Utah Code subsection 63G-7-201(4)(s) lists, we share Armenta's belief that the Legislature had a certain type of emergency in mind when it enacted that provision. In subsection (s), the Legislature enumerates several types of specific emergencies, including "fighting fire," "regulating, mitigating, or handling hazardous materials or hazardous wastes," and "intervening during a dam emergency." *See* UTAH CODE § 63G-7-201(4)(s). It also immunizes those involved in other activities, including "providing emergency medical assistance," "evacuat[ing]" in an "emergency," and "transporting or removing an injured person to a place where emergency medical assistance can be rendered or where the person can be transported by a licensed ambulance service." *Id.*

¶31 Having immunized entities engaged in activities involving emergencies of a certain type—fires and dam bursts, for example—it stands to reason that what the Legislature had in mind when it enacted subsection (s)(i) was the government's ability to respond to those types of emergencies—namely, to provide "medical assistance" resulting from those types of emergencies.

¶32 UFA challenges this interpretation on several grounds. It first argues that we apply certain canons of construction, including *noscitur a sociis*, only when the statutory language is ambiguous. It finds support for that proposition in three of this court's declarations. In *Graves v. North Eastern Services, Inc.*, we said that the *ejusdem generis* canon, a cousin to *noscitur a sociis*, "comes into

play only in cases of ambiguity as to the meaning or scope of the general term." 2015 UT 28, ¶ 55, 345 P.3d 619. In another case, we also stated that "when the dictionary is inconclusive, we turn to other canons of statutory construction to focus our interpretation." *GeoMetWatch*, 2018 UT 50, ¶ 21. And in *Great Salt Lake Authority v. Island Ranching Co.,* we explained that "[t]he rules of statutory construction . . . were developed to aid in determining the intent of legislation where meaning is obscure or uncertain and not to destroy that which is clearly apparent." 414 P.2d 963, 966 (Utah 1966).

¶33 If these were the only occasions on which we had discussed when we apply certain textual canons of construction, UFA's argument might be persuasive. But that is not the way we have described statutory interpretation. We consistently begin that exercise with the statute's plain language, "from which we seek to ascertain the intent and purpose of the legislature." *Thayer v. Wash. Cnty. Sch. Dist.*, 2012 UT 31, ¶ 12, 285 P.3d 1142. We also examine "the plain language in light of the relevant context of the statute, which includes the overall structure of the statutory scheme." *Williamson v. MGS by Design, Inc.*, 2022 UT 40, ¶ 13, 521 P.3d 866 (cleaned up); *see also Hertzske v. Snyder*, 2017 UT 4, ¶ 12, 390 P.3d 307. And that inquiry, in many instances, involves applying the "textual tools of interpretation." *Hinton*, 2025 UT 4, ¶ 60 n.11.

¶34 To the extent we have suggested that we apply the textual tools of interpretation only "in cases of ambiguity as to the meaning or scope of the general term" and where "meaning is obscure or uncertain," *Graves*, 2015 UT 28, ¶ 55; *Great Salt Lake Auth.*, 414 P.2d at 966, we have been less than careful. Indeed, if we were to take those statements at face value, there are a whole host of canons that inform how we understand text that we would deny ourselves access to. Take the conjunctive/disjunctive canon, for example. Under this canon, "*And* joins a conjunctive list, *or* a disjunctive list." SCALIA & GARNER, *supra*, at 116. Put differently, "*and* combines items while *or* creates alternatives." *Id.* Or consider the mandatory/permissive canon, which provides that "[m]andatory words," like "*shall*," "impose a duty"; "permissive words," like "*may*," "grant discretion." *Id.* at 112. Or the grammar canon, which instructs that "[w]ords are to be given the meaning that proper grammar and usage would assign them." *Id.* at 140. And finally, although we could go on and on, the whole-text canon, directing that "[t]he text must be construed as a whole." *Id.* at 167.

¶35 In other words, UFA's argument that we apply the *noscitur a sociis* canon only when statutory language is ambiguous is incorrect. Here, we need not discern a textual ambiguity to employ the *noscitur a sociis* canon. Rather, it, like other textual canons, is a tool in our plain-language toolkit that we use to interpret text without resort to non-textual sources.

¶36 UFA argues in the alternative that Armenta misapplies the *noscitur a sociis* canon because he has chosen an inapt commonality. According to UFA, some of the activities subsection (s) immunizes, like "fighting fire" or "regulating, mitigating, or handling hazardous materials or hazardous wastes," do "not necessarily entail catastrophic destruction." (Quoting UTAH CODE § 63G-7-201(4)(s)(ii), (iii).) We understand UFA's point. There are small fires and hazardous waste spills that do not cause a calamity. The regulation of hazardous materials or wastes, too, does not necessarily describe an emergent situation. But we nevertheless conclude that when we look at the list and the activities that the Legislature chose to include in the list, the better reading is one based on a commonality of a disastrous—or potentially disastrous—event.

¶37 UFA similarly argues that "reading [Armenta's] 'disaster' limitation" into the statute nullifies Utah Code subsection 63G-7-201(4)(p). That subsection excepts "the management of flood waters, earthquakes, or natural disasters" from the waiver of immunity. UTAH CODE § 63G-7-201(4)(p). We understand this point as well. We frequently apply the independent meaning canon to presume that the Legislature intends each of a statute's subsections to have independent significance. *See, e.g., Lancer Ins. v. Lake Shore Motor Coach Lines, Inc.*, 2017 UT 8, ¶ 13, 391 P.3d 218.

¶38 UFA's argument ignores, however, that even though Utah Code subsection 63G-7-201(4)(p) references emergencies of a certain scope and scale, it immunizes a different activity than those listed in subsection 201(4)(s). Subsection (p) retains immunity for "*the management* of flood waters, earthquakes, or natural disasters." UTAH CODE § 63G-7-201(4)(p) (emphasis added). In contrast, subsection (s) largely immunizes the actual response to those emergencies. *See id.* § 63G-7-201(4)(s). UFA's proffered interpretation of subsection (s) does not, therefore, rob subsection (p) of independent meaning.

¶39 Finally, even if we were uncertain about what the Legislature intended—i.e., if we concluded that after reviewing the

UGIA's plain language, the statute "can reasonably be understood to have more than one meaning," *see Arnold v. Grigsby*, 2009 UT 88, ¶ 19, 225 P.3d 192—we would reject the district court's and UFA's interpretation on constitutional avoidance grounds. "The canon of constitutional avoidance is an important tool for identifying and implementing legislative intent." *Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 23, 332 P.3d 900. But the canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means* of *choosing between them*." *State v. Garcia*, 2017 UT 53, ¶ 50 n.7, 424 P.3d 171 (cleaned up).

¶40 When faced with two plausible interpretations, we presume that the Legislature "did not intend the interpretation which raises serious constitutional doubts." *Id.* ¶ 59 (cleaned up). Another rationale underlying constitutional avoidance is that we "avoid[] constitutional questions except as a last resort." *Utah Stream Access Coal. v. VR Acquisitions, LLC*, 2019 UT 7, ¶ 104, 439 P.3d 593 (Himonas, J., concurring in part) (cleaned up); *see also Lyon v. Burton*, 2000 UT 55, ¶ 10, 5 P.3d 616 ("[T]his Court should avoid addressing constitutional issues unless required to do so." (cleaned up)); *Gardner v. State*, 2010 UT 46, ¶ 93, 234 P.3d 1115 (noting "our obligation to avoid addressing constitutional issues unless required to do so" (cleaned up)); *League of Women Voters of Utah v. Utah State Leg.*, 2024 UT 21, ¶ 96, 554 P.3d 872 (discussing same).

¶41 Accepting the district court's interpretation of the statute would require us to address Armenta's constitutional challenge to the UGIA. Armenta contends that the district court's application of the UGIA in this instance violates the Utah Constitution's Open Courts Clause because it "abrogates a cause of action that existed prior to the" UGIA's enactment. The constitutional avoidance principle gives us an additional basis to disfavor the district court's and UFA's interpretation, and favor the reading we adopt.

## CONCLUSION

¶42 Armenta argues that the district court misinterpreted the UGIA when it applied the "providing emergency medical assistance" exception to immunize UFA's response to Armenta's 911 call. When we consider that provision in context, we agree. The exception does not apply, and UFA is not immune from Armenta's suit. We reverse and remand.