2026 UT App 70

# THE UTAH COURT OF APPEALS

ERIC HASEMEYER,
Appellee,
*v.*
MATTHEW LEFEVRE,
Appellant.

Opinion
No. 20250527-CA
Filed May 7, 2026

Fifth District Court, Cedar City Department
The Honorable Meb Anderson
No. 250500047

Justin W. Starr and Jonathan M. Burt,
Attorneys for Appellant

James W. Jensen, Attorney for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred except
as to Part I(C), which represents the views of JUDGE TENNEY
alone.

TENNEY, Judge:

¶1　　Matthew LeFevre and Eric Hasemeyer are neighbors in a rural part of southern Utah. LeFevre believes that he has an easement that runs across the top of Hasemeyer's property, and LeFevre plans to use that easement to build an access road to reach an undeveloped part of his property. On three occasions in late 2024 and early 2025, LeFevre entered Hasemeyer's property with his tractor. On the first two of these occasions, LeFevre began grading his planned road, destroying trees and vegetation as he did. On the third occasion, LeFevre drove his tractor at Hasemeyer's wife before stopping the tractor and having a verbal confrontation with Hasemeyer and his wife.

¶2 Hasemeyer subsequently obtained an ex parte civil stalking injunction that prohibited LeFevre from accessing Hasemeyer's property. LeFevre challenged the ex parte civil stalking injunction, but after an evidentiary hearing, the district court re-issued it.

¶3 LeFevre now appeals the civil stalking injunction, and he raises four issues for our review. First, LeFevre argues that the court erred in concluding that his conduct satisfied the statutory elements for such an injunction. Second, LeFevre argues that the court erred when it improperly delayed scheduling the evidentiary hearing. Third, LeFevre argues that the court was legally prohibited from issuing the civil stalking injunction because there was a pending civil case about the easement. Finally, LeFevre challenges the scope of the civil stalking injunction.

¶4 For the reasons set forth below, we see no reversible error and therefore affirm.

## BACKGROUND[1]

### *The Disputed Easement*

¶5 Hasemeyer and LeFevre are neighbors in a rural part of southern Utah. Hasemeyer and his wife (Wife) moved into their house in 2018, and LeFevre and his wife moved into their house sometime thereafter. An easement of some sort historically ran through the north end of Hasemeyer's property and connected to LeFevre's property. Hasemeyer believes that the easement no longer exists, while LeFevre believes that it still does. The

---

1. "In the context of a civil stalking injunction, we will recite the facts in a light most favorable to the trial court's findings." *Anderson v. Deem*, 2023 UT App 48, n.1, 530 P.3d 945 (quotation simplified).

disputed easement is only accessible through a locked county gate. LeFevre hopes to build a house on an undeveloped portion of his property that he would access using the disputed easement.

*Incidents Giving Rise to the Stalking Injunction*

¶6 The events that gave rise to this case began with a confrontation that occurred on October 14, 2024 (the October incident). That day, LeFevre asked Hasemeyer if he could borrow a key to the county gate. In making this request, LeFevre did not say why he needed the key.[2] Hasemeyer was mowing his back lawn at the time, and he provided the key. A short time later, Hasemeyer "saw trees moving and falling down" toward the back of his property. Hasemeyer went to the back of his property and found that LeFevre had destroyed two or three mature trees with his tractor. When Hasemeyer confronted LeFevre and asked him what he was doing, LeFevre responded that he was removing the trees because he had an easement. Hasemeyer later said that this put him "in a state of extreme emotional distress" and that he vomited in the backyard as a result. LeFevre stopped removing trees after Hasemeyer confronted him.

¶7 Hasemeyer retained an attorney, and on October 16, 2024, this attorney sent LeFevre a cease-and-desist letter. The letter noted that based on Hasemeyer's counsel's "preliminary review of property deeds and related documents, the alleged easement does not exist." Hasemeyer's counsel stated, however, "Notwithstanding my preliminary review and findings, I have ordered a title search related to the subject property and alleged easement to formally ascertain the validity thereof." The letter "demand[ed]" that LeFevre "immediately cease and desist any further trespass and damage" to Hasemeyer's property.

---

2. Although the record indicates that "both parties now have a key to get through" the county gate, at the time of the October incident, only Hasemeyer had a key.

¶8 Sometime after the October incident, LeFevre sent Hasemeyer an email with a record survey that he believed supported the existence of the easement.[3]

¶9 On November 7, 2024 (the November incident), LeFevre returned to the disputed easement with what the record refers to as "heavy equipment" (although, in context, it seems to have again been his tractor), and without Hasemeyer's permission, LeFevre removed additional trees and shrubs and began to grade a road.[4]

¶10 On February 17, 2025, LeFevre emailed Hasemeyer, indicating that he was awaiting a response from Hasemeyer's counsel about the documentation he had sent that, in LeFevre's view, supported his claim that there was an easement. The following day, Hasemeyer's counsel wrote a second letter to LeFevre. This letter contended that LeFevre only had an easement through the southern part of Hasemeyer's property—not the northern part, which was where LeFevre had cut down the trees and shrubs and was trying to build a road. The letter reiterated the earlier demand that LeFevre "immediately cease and desist any further trespass and damage to [Hasemeyer's] property."

¶11 On February 26, 2025 (the February incident), Wife was working in a greenhouse in the backyard on the northern end of the Hasemeyer property. Wife observed LeFevre doing work with his truck and tractor, moving dirt on his property. When LeFevre began driving his tractor toward the disputed easement, Wife stepped out onto the path where LeFevre was approaching. LeFevre was "going slow" and "knew [Wife] was there," but he did not stop until he was "right in front of [Wife's] legs." The

---

3. It is unclear from the record whether LeFevre sent this email before or after he received the cease-and-desist letter.

4. It is unclear from the record whether either Hasemeyer or Wife was present on this occasion.

tractor was close enough to Wife that she could reach out and touch it. Wife told LeFevre to stay off the Hasemeyer property, and LeFevre responded by laughing. LeFevre then left, driving back to his house by using a county road instead of the disputed easement. In the meantime, Hasemeyer had seen Wife's interaction with LeFevre from inside his house, and he called 911 to report LeFevre's trespass onto his property.

¶12 LeFevre returned to his property and put a blade extension on his tractor. About 10 to 15 minutes after the initial confrontation, and before police had responded to the 911 call, LeFevre approached the disputed easement again in his tractor. Wife saw LeFevre approaching from a distance, and when LeFevre "turn[ed] the corner really quick" onto the disputed easement, Wife took a short video of LeFevre's approach with her phone. Wife thought that LeFevre was moving "really, really fast," as opposed to the earlier encounter in which he was driving slower. Wife saw LeFevre lifting the tractor's blade as he approached her. Wife thought LeFevre would stop, but he just got "closer and closer." Wife had to back up "two or three steps" to get out of the way of the moving tractor, and LeFevre "kept coming . . . even though [she] was backing up." As LeFevre continued coming toward her, Wife took a second short video.

¶13 Hasemeyer observed this encounter and left his house to meet Wife. When Wife screamed for Hasemeyer, LeFevre stopped the tractor. LeFevre exited the tractor, and he, Wife, and Hasemeyer then had a heated conversation about the property dispute.[5]

¶14 Wife later testified that she felt "very concerned about [her] own safety" during this encounter and that she felt like LeFevre's actions were "unreasonable" and "very scary." She described seeing his behavior "escalate." Hasemeyer also testified that he

---

5. This confrontation was soon joined by LeFevre's wife and a friend, who had been walking nearby.

was "afraid" for himself and Wife and that he didn't "know what could happen next."

*The Ex Parte Civil Stalking Injunction and LeFevre's Request for an Evidentiary Hearing*

¶15     On March 7, 2025, Hasemeyer filed a petition for a civil stalking injunction. In the request, Hasemeyer detailed the October incident, the November incident, and the February incident. Hasemeyer was listed as the sole Petitioner in the request, but he also listed Wife as a witness to the stalking. Hasemeyer asked the court to order LeFevre to (1) stay away from his "home" and (2) have no contact with him or Wife.

¶16     The district court entered an ex parte civil stalking injunction the same day. In the ex parte civil stalking injunction, Wife was listed as an "Other Person[] Protected by this Order." The court ordered LeFevre not to contact either Hasemeyer or Wife, and it further ordered LeFevre to "[s]tay away from" their "current or future home, premises or property."

¶17     On March 10, 2025, LeFevre filed a request for an evidentiary hearing, and a hearing was subsequently scheduled for March 24, 2025. At that hearing, LeFevre, who was represented by counsel, indicated that he was prepared to proceed. The district court, however, informed the parties that it was "definitely not having an evidentiary hearing today." In response, LeFevre argued that the civil stalking injunction statute "require[d] an evidentiary hearing for the Respondent within ten days of being served" with the order. LeFevre then asserted that the ex parte civil stalking injunction should be dismissed because no evidentiary hearing was going to be held within the time set forth by statute. The court responded, "I can just tell you that the courts in this district don't have the bandwidth to schedule these hearings within ten days . . . ." The court expressed its view that the statute required "a hearing" within ten days, but not necessarily an "evidentiary hearing." The court informed the

parties that it would not have a two-hour window in which to conduct an evidentiary hearing until June 4, 2025. But after further discussion with the parties and the court clerk, the court agreed to schedule an evidentiary hearing for April 7, 2025.

### The Evidentiary Hearing

¶18　The evidentiary hearing was held on April 7, and in support of the petition, Hasemeyer and Wife each testified about the events described above and about how those events had affected them. The two videos Wife took during the February incident were admitted into evidence.

¶19　For his part, LeFevre called an officer (Officer) who had been dispatched to Hasemeyer's house after Hasemeyer had called 911 during the February incident. Officer testified that Wife had shown him the videos that she took of LeFevre approaching her with the tractor. Officer said that "what [he] saw in the video was that [Wife] had herself placed in front of the tractor with ample amount of time to get out of the way." Officer described Wife as "willingly putting [her]self in that situation."

¶20　LeFevre and his wife also testified. LeFevre testified that there was no way to access the easement without cutting down the trees and shrubs he had removed. He testified that he had never approached the Hasemeyers or entered their property with the "intention" of harassing, surveilling, or threatening them.

¶21　During this hearing, Hasemeyer, Wife, LeFevre, and LeFevre's wife also presented evidence about the property dispute and about whether there was an easement. Both parties introduced as exhibits various county documents supporting their respective positions about whether the easement existed.

¶22　After the parties had presented the above evidence, the court informed them that they had already gone 35 minutes over the allotted time and that they would have to make closing

arguments on another date. At this point, LeFevre informed the court that he had filed a civil action to quiet title in the easement, though he admitted that this filing had not yet been served on the Hasemeyers. LeFevre made no further argument about any legal impact of the quiet title case on this civil stalking case.

*Closing Arguments and the Civil Stalking Injunction*

¶23 The parties returned to court on April 21, 2025, for closing arguments. Hasemeyer (through counsel) began by discussing the "legal standards" that define stalking, which, as he put it, are "that the person intentionally or knowingly engaged in a course of conduct directed at a specific person" and "that the person must know, or should know, that the course of conduct would cause a reasonable person to fear for the person's own safety, or suffer emotional distress." *See* Utah Code § 76-5-106.5(2)(a). Hasemeyer then discussed the October incident, the November incident, and the February incident, after which he argued that these incidents collectively satisfied the legal standard for stalking. Hasemeyer argued that "[e]ven if you have an easement, you can't do those types of things."

¶24 By contrast, LeFevre (also through counsel) argued that "this is about a property dispute" and that LeFevre's actions were "simply to try to access [his undeveloped property] to get it ready for development." LeFevre argued that the October incident did not constitute stalking because Hasemeyer approached LeFevre (not the other way around) and because LeFevre stopped cutting down the trees once Hasemeyer spoke with him. LeFevre argued that he went back onto Hasemeyer's property again only after "he found that he had an easement there." LeFevre further argued that the Hasemeyers "sought [LeFevre] out" in the February incident and that it was "reasonable to believe that [LeFevre] wasn't trying to run [Wife] over." LeFevre argued that he "genuinely believed" he "had a property interest" and that he was "just exercising [his] property rights." LeFevre argued that it was "reasonable" that the Hasemeyers were upset that LeFevre

wanted to develop the easement, but he contended that a stalking injunction "is not the reasonable way . . . to go about solving this problem" because "entering an injunction in this matter against [LeFevre] would have much greater ramifications than what a temporary restraining order would do."

¶25 At this point, the district court interrupted LeFevre's argument and proceeded to rule from the bench. The court started out by saying that it was "not ruling today on whether there's an easement." But the court then expressed its view that it was not "reasonable for a neighbor to think that they get to create a road without express permission of the county," observing that "it's a county function to create roads."

¶26 Turning to the merits, the court ruled that Hasemeyer had "met [his] burden under the civil stalking injunction." The court opined that it "didn't think it was close" when it "looked at the video[s]" Wife had recorded of LeFevre approaching her in his tractor. The court found "[t]here were two or more acts." The court observed that LeFevre was told to "stay off their property" but that he "went back on their property[] and did so in a menacing way." The court referred to LeFevre "ripping out sage brush and trees" and the property being "torn up." The court again repeated its conclusion that there were "two acts." And the court then found that "the Hasemeyer[s] [had] suffered emotional distress, meaning significant mental or psychological suffering." The court thus ruled that LeFevre had "stalked sufficient enough for" it to "make the stalking injunction permanent."[6]

---

6. The district court did not issue a written civil stalking injunction after this hearing. Instead, as indicated, its oral ruling simply made the ex parte injunction "permanent." We note that although the court used the term "permanent," under both the terms used in the ex parte civil stalking injunction and those used in the governing statute, this injunction expires "three years after the

(continued…)

ISSUES AND STANDARDS OF REVIEW

¶27    On appeal, LeFevre argues that the district court erred in four ways. First, he argues that the court erroneously concluded that his conduct satisfied the elements of stalking. Second, he argues that the court erred by delaying the evidentiary hearing beyond what the civil stalking injunction statute allows. Third, he argues that the court erred by issuing the civil stalking injunction given that there was a pending civil action between the parties about the easement. And fourth, he argues that the court erred by issuing what he refers to as an "overbroad civil stalking injunction."

¶28    We review the district court's "interpretation and application of the stalking statute" for "correctness, affording no deference to the district court's legal conclusion." *Harris v. Hunt*, 2024 UT App 117, ¶ 9, 557 P.3d 228 (quotation simplified). This includes the court's conclusion that LeFevre directed his conduct at Hasemeyer. *See Ragsdale v. Fishler*, 2021 UT 29, ¶ 15, 491 P.3d 835; *Richins v. Weldon*, 2023 UT App 147, ¶ 41, 541 P.3d 274. By contrast, the district court's conclusion that the conduct would cause a reasonable person to fear for their safety or suffer emotional distress is a question of fact that we review for clear error. *See Ragsdale*, 2021 UT 29, ¶ 16; *Richins*, 2023 UT App 147, ¶ 42.[7]

---

day on which the ex parte civil stalking injunction [was] served." *See* Utah Code § 78B-7-701(5)(c)(iii).

7. For purposes of providing clarity for future cases, we think it helpful to expound on this a bit further. As will be discussed shortly, when a respondent challenges an ex parte civil stalking injunction, the district court conducts an evidentiary hearing, after which the court decides whether to revoke or continue the ex parte civil stalking injunction.

(continued…)

As part of that ruling, a district court might issue findings of fact before determining whether the conduct satisfied the statutory elements. On appeal, an appellant might choose to argue that there was insufficient evidence to support the court's findings about who did what to whom. *See, e.g.*, *Sheeran v. Thomas*, 2014 UT App 285, ¶ 8 & n.3, 340 P.3d 797. If such an argument is made, the appellate court would give the usual deference to the district court's factual findings (including to the court's weighing of the evidence). Our recent decision in *Schmidt v. Petersen*, 2025 UT App 12, 564 P.3d 526, provides a good example of this. There, after an evidentiary hearing, the district court revoked an ex parte civil stalking injunction. *See id.* ¶ 19. Of note, the court did not do so based on a conclusion that the conduct at issue didn't satisfy the statutory elements; instead, the court concluded that the petitioner had not sufficiently proven that the respondent even did the things in question. *See id.* ¶¶ 18, 34. When the petitioner challenged that ruling on appeal, we deferred to the district court's weighing of the evidence and its conclusion about what facts had not been proven. *See id.* ¶¶ 22, 25, 31.

As discussed above, however, our cases have held that a district court's "interpretation and application of the stalking statute" are reviewed "for correctness, affording no deference to the district court's legal conclusion." *Harris v. Hunt*, 2024 UT App 117, ¶ 9, 557 P.3d 228 (quotation simplified); *see also Ragsdale v. Fishler*, 2021 UT 29, ¶ 15 n.3, 491 P.3d 835 (providing that the appropriate standard of review when interpreting and applying the civil stalking statute is a question of law reviewed for correctness). Thus, to make things clear for future cases: if an appellant challenges a district court's factual findings, those will be reviewed under the standard of review applicable to factual findings, but if an appellant instead challenges the court's interpretation of the statute or application of it, those issues will be reviewed for correctness.

Turning to this appeal, the factual questions about who did what and when are largely undisputed. As a result, we

(continued…)

ANALYSIS

I. Stalking Elements

¶29    LeFevre first argues that his conduct did not support the issuance of a civil stalking injunction. On the state of this record and the controlling law, we disagree.

¶30    Utah's civil stalking injunction statute allows a court to issue an ex parte civil stalking injunction if the court has "reason to believe that an offense of stalking has occurred." Utah Code § 78B-7-701(4)(a). If an ex parte civil stalking injunction is issued, the person against whom it was entered (the respondent) can request a hearing to challenge it. *See id.* § 78B-7-701(5)(a). At that hearing, the person requesting the injunction (the petitioner) bears the burden of "show[ing] by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred." *Id.* § 78B-7-701(5)(b)(ii). Based on its consideration of the evidence, "the court may modify, revoke, or continue the injunction." *Id.* § 78B-7-701(6)(a).

¶31    By statute, stalking contains two key elements. *See Ragsdale v. Fishler*, 2021 UT 29, ¶ 25, 491 P.3d 835. The first is whether the respondent "engage[d] in a course of conduct directed at a specific individual"; the second is whether the respondent knew or was "reckless as to whether the course of conduct would cause a reasonable person . . . to fear for the individual's own safety or the safety of a third individual" or "suffer other emotional distress."

---

understand LeFevre's arguments that we address in Part I(A) to be about the court's conclusion that the facts satisfied the elements of the statute. Under settled standards of review, those arguments are accordingly reviewed for correctness. By contrast, the arguments that we address in Part I(B) concern the fear or distress element. As noted, that aspect of the ruling is factual in nature and is reviewed for clear error.

Utah Code § 76-5-106.5(2)(a)(i)–(ii).[8] "A district court may enjoin an alleged stalker only if both elements are met." *Ragsdale*, 2021 UT 29, ¶ 25.

¶32 Here, LeFevre argues that (A) he did not engage in a course of conduct and (B) even if he did, it would not have caused a reasonable person to fear for the safety of the individual or another. We address each argument in turn.

## A. Course of Conduct

¶33 By statute, a course of conduct "means two or more acts directed at or toward a specific individual." Utah Code § 76-5-106.5(1)(a)(i). A "single isolated act" therefore "cannot qualify as a course of conduct." *Richins v. Weldon*, 2023 UT App 147, ¶ 47, 541 P.3d 274 (quotation simplified).

¶34 In his brief, LeFevre makes two arguments about this element: first, he argues that there were not two or more acts; second, he argues that even if there were two or more acts, they were not directed at "Hasemeyer or [Wife]."

### 1. Two or More Acts

¶35 LeFevre first challenges the district court's conclusion that there were two or more acts. In LeFevre's view, the court "identified only the February 2025 incident where LeFevre was driving his tractor while [Wife] filmed him." Although the court could have perhaps been clearer, we read its oral ruling differently than LeFevre does.

---

8. Utah Code section 76-5-106.5 defines "stalking" for purposes of the criminal code, but as we've previously explained, these same elements define "stalking" for purposes of a civil stalking injunction as well. *See Anderson v. Deem*, 2023 UT App 48, ¶ 23 n.6, 530 P.3d 945.

¶36 The petition for a civil stalking injunction expressly invoked the October incident, the November incident, and the February incident. The parties presented evidence about each incident at the evidentiary hearing. And in closing arguments, Hasemeyer invoked all three incidents as a basis for asking the court to continue the civil stalking injunction. In doing so, Hasemeyer repeatedly focused on LeFevre's alleged trespasses, his acts of destroying trees and vegetation, and the fact that, during the February incident, LeFevre ran his tractor at Wife.

¶37 At the outset of the oral ruling, the court concluded that there were indeed "two or more acts." Elaborating, the court found that after LeFevre "was told to stay off" Hasemeyer's property, he "resume[d] and went back on their property." The court referred to LeFevre "ripping out sage brush and trees" and the property being "torn up." And it also referred to the February incident in which LeFevre drove "at [Wife] in a way to make her have to back up."

¶38 In context, the court's reference to LeFevre entering Hasemeyer's property after being "told to stay off" seems to have been a reference to both the November incident and the February incident, insofar as LeFevre had been served with a cease-and-desist letter in October 2024 and yet returned to the property on both occasions. The court's reference to LeFevre "ripping out sage brush and trees" and the property being "torn up" appears to be a reference to either the October incident or the November incident (or both), inasmuch as LeFevre tore up vegetation with his tractor on both occasions.[9] And the court's reference to LeFevre driving at Wife "in a way to make her have to back up" was a clear reference to the February incident. So viewed, the court appears to have found that there were two or more acts

---

9. By contrast, this statement doesn't appear to be a reference to the February incident, inasmuch as there was no testimony that LeFevre tore anything up with his tractor that day.

based on all of these facts, and this conclusion was supported by the evidence.

2.      Directed at a Specific Individual

¶39     As noted, the course of conduct element also requires that the "two or more acts" be "directed at a specific individual." Utah Code § 76-5-106.5(1)(a)(i), (2)(a). In LeFevre's view, the acts in question did not satisfy this element because his only "purpose" was to access his property through what he believed was a valid easement. Responding to the claims about him removing trees, for example, LeFevre asserts that there was "no evidence" that he did so "for any reason other than to access his property." In LeFevre's view, his actions therefore did not support a civil stalking injunction because they were directed at property interests, as opposed to being "directed at Hasemeyer, or indeed any individual." On the state of the statute and the current caselaw, however, we conclude that the evidence satisfied this part of the element.[10]

---

10. Hasemeyer was the only named petitioner in the request for a civil stalking injunction. As noted above, however, the district court relied on LeFevre driving his tractor at Wife as one of the predicate "acts," and the injunction then specifically listed Wife as a protected person.

In his briefing, LeFevre seems to have assumed that actions taken against either Hasemeyer or Wife could satisfy the statute. With slight variations in phrasing, for example, he repeatedly asserted that none of his acts were "directed at Hasemeyer or any other specific individual." Indeed, at one point, he more specifically asserted that no evidence showed that he "direct[ed] any conduct at Hasemeyer or [Wife]."

But we see no place in the brief where LeFevre argued (much less meaningfully) that (1) the act of driving the tractor at Wife could not satisfy this element because she was not a named

(continued…)

¶40   The statute defines the term "[c]ourse of conduct" as "two or more acts directed at or toward a specific individual," and it then says this "includ[es]" various actions that are set forth in a statutory list. *Id.* § 76-5-106.5(1)(a)(i). Among those are the following:

> (A) acts in which the actor follows, monitors, observes, photographs, surveils, threatens, or communicates to or about an individual, or interferes with an individual's property:
>
>> (I) directly, indirectly, or through any third party; and
>>
>> (II) by any action, method, device, or means; or
>
> (B) when the actor engages in any of the following acts or causes someone else to engage in any of these acts:
>
>> (I) approaches or confronts an individual;
>>
>> [or] . . .
>>
>> (III) appears at an individual's residence or contacts an individual's neighbor, or enters property owned, leased, or occupied by an individual . . . .

*Id.*

---

petitioner or (2) the court should have differentiated between acts directed at Hasemeyer and those directed at Wife. Instead, like the district court, LeFevre's brief essentially treats Hasemeyer and Wife collectively. On the state of the briefing, we'll follow suit.

¶41 "[N]othing in the statute defines the term 'directed at.'" *Ragsdale*, 2021 UT 29, ¶ 31. "Nor does it expressly indicate that the petitioner must be the ultimate target of a respondent's course of conduct." *Id.* (quotation simplified). Rather, "under the statute's plain language, a respondent directs conduct at a petitioner by engaging in behavior contemplated by the statute two or more times." *Id.* Accordingly, "regardless of whether a petitioner is a respondent's ultimate target, the fact that the respondent engaged in any act proscribed by the statute two or more times makes his or her conduct 'directed at' the petitioner." *Id.* ¶ 32.

¶42 In *Ragsdale*, our supreme court further held that "the person toward whom a respondent's behavior is 'directed at' is not necessarily determined by his or her subjective intent." *Id.* ¶ 37. In the supreme court's view, this question is "determined by an objective assessment of whether the respondent engaged in conduct prohibited by the stalking statute." *Id.* The supreme court thus held that a district court should not determine whether the respondent "subjectively targeted" the petitioner, but the court should instead "analyze[] whether" the respondent "objectively engaged in conduct proscribed by the stalking statute." *Id.* ¶ 41.

¶43 We recently applied these principles in *Harris v. Hunt*, 2024 UT App 117, 557 P.3d 228. In that case, the district court concluded that the respondent had committed stalking through a series of Facebook posts. *See id.* ¶ 2. On appeal, the respondent argued that "his posts on his personal Facebook page were not 'directed at'" the petitioner because he had "intended them to be seen only by a limited number of followers and not by" the petitioner "or anyone in his orbit." *Id.* ¶ 12. But in express reliance on *Ragsdale*, we held that the respondent's "subjective intent regarding who he thought was the target of his posts [was] largely irrelevant." *Id.* Because the Facebook posts qualified as acts for purposes of the civil stalking statute, we held that they qualified as "a course of conduct directed at" the petitioner "as that term is defined in Utah's stalking statute." *Id.* ¶ 14 (quotation simplified).

¶44　The same is true here too. Again, the stalking statute includes acts in which the respondent "enters property owned . . . by an individual," Utah Code § 76-5-106.5(1)(a)(i)(B)(III), or "interferes with an individual's property," *id.* § 76-5-106.5(1)(a)(i)(A). It is undisputed that in each of the incidents in question (i.e., the October incident, the November incident, and the February incident), LeFevre entered property that Hasemeyer owns. And in the October and November incidents, LeFevre cut down trees on Hasemeyer's property, which would also constitute interference with Hasemeyer's property.[11]

¶45　Moreover, the stalking statute also includes acts in which the respondent "approaches or confronts an individual." *Id.* § 76-5-106.5(1)(a)(i)(B)(I). LeFevre did so in the February incident by driving his tractor toward Wife, as well as by engaging in a heated confrontation with Hasemeyer and Wife on Hasemeyer's property.[12]

¶46　In short, there was evidence that LeFevre committed at least two acts that could serve as predicate acts for purposes of the stalking statute. These acts could accordingly support the

---

11. As discussed, LeFevre believed that he had a right to do so because of an easement. But it's undisputed that Hasemeyer owned the property at all relevant times, which meant that, at minimum, LeFevre was entering Hasemeyer's property, which is enough for the "two or more acts" part of this analysis.

12. Again, the district court treated Hasemeyer and Wife collectively, and LeFevre has not challenged that aspect of the decision on appeal. Moreover, we note that LeFevre argues that the verbal confrontations do not count because the Hasemeyers initiated them. But again, the second confrontation in the February incident occurred after LeFevre had left the property and had voluntarily returned, this time with a blade attached to his tractor.

conclusion that LeFevre had engaged in "a course of conduct directed at [Hasemeyer], as that term is defined in Utah's stalking statute." *Harris*, 2024 UT App 117, ¶ 14 (quotation simplified).

B.     Fear or Emotional Distress

¶47     The second element of stalking turns on whether the respondent "knows or is reckless as to whether the course of conduct would cause a reasonable person: (i) to fear for the individual's own safety or the safety of a third individual; or (ii) to suffer other emotional distress." Utah Code § 76-5-106.5(2)(a)(i)–(ii). Emotional distress "means significant mental or psychological suffering, whether or not medical or other professional treatment or counseling is required." *Id.* § 76-5-106.5(1)(a)(ii)(A).

¶48     When assessing such a claim, a court "should consider the course of conduct cumulatively" rather than "consider[ing] each act in isolation." *Richins*, 2023 UT App 147, ¶ 66 (quotation simplified). When viewed cumulatively, "acts that seem perfectly innocent or even well intentioned may constitute stalking." *Ragsdale*, 2021 UT 29, ¶ 45 (quotation simplified); *see also Richins*, 2023 UT App 147, ¶ 66 (noting that an appellant's argument "misconstrue[d] the law" when it suggested that a district court should look at each act leading to a course of conduct "separately" to determine whether the act "in isolation would . . . have caused a reasonable person to feel fear or emotional distress"). "For example, conduct such as sending the victim a dozen roses may seem benign and loving to the casual observer, but could mean a very different thing when understood in the context of the victim's experience." *Ragsdale*, 2021 UT 29, ¶ 45 (quotation simplified). Courts thus consider such things as the petitioner's "background," the petitioner's "knowledge of and relationship with" the respondent, "any history of abuse between the parties, and the cumulative effect" of the respondent's "repetitive conduct." *Anderson v. Deem*, 2023 UT App 48, ¶ 29, 530 P.3d 945 (quotation simplified).

¶49    Here, the relevant circumstances include the following:

- In the October incident, LeFevre entered Hasemeyer's property and cut down two or three mature trees with his tractor, and he did so without Hasemeyer's permission.

- Almost immediately after the October incident, Hasemeyer retained counsel, who sent LeFevre a cease-and-desist letter demanding that LeFevre refrain from "any further trespass and damage" to Hasemeyer's property.

- Despite having received the cease-and-desist letter, LeFevre returned to Hasemeyer's property in November, removed additional trees and shrubs, and began to grade a road.

- Around this time, LeFevre sent Hasemeyer documents that he claimed showed he had a valid easement.

- In the February incident, LeFevre attempted to drive his tractor onto the disputed easement, but Wife stepped in front of him. Although LeFevre was "going slow," he knew Wife was there and did not stop until he was "right in front of [Wife's] legs." Wife asked LeFevre to leave the property, and LeFevre laughed.

- LeFevre then briefly left Hasemeyer's property, but when he returned a short time later with a blade extension on his tractor, he was driving "really, really fast." Wife stood in the disputed easement, thinking LeFevre would stop, but LeFevre just got "closer and closer" to her before ultimately stopping.

¶50    When these acts are viewed cumulatively, we're not persuaded that the district court clearly erred when it determined that LeFevre's course of conduct would cause a reasonable person to suffer fear or other emotional distress. LeFevre engaged in a

pattern of escalating behavior that involved entering the property, damaging trees and vegetation, and, in the final incident, driving a tractor toward Wife. And LeFevre did so despite receiving a cease-and-desist letter from an attorney. In these circumstances, the court could reasonably conclude that the cumulative effect of this conduct would cause emotional distress to a reasonable person.

¶51    The court therefore did not err in concluding that LeFevre's conduct satisfied the second element of the stalking statute. Because we have also concluded that the evidence supported the conclusion that LeFevre engaged in a course of conduct, we reject this aspect of LeFevre's appeal.

C.    Suggested Course Correction[13]

¶52    In Part I(A) of this opinion, we addressed LeFevre's claim that the course of conduct element of stalking was not satisfied because he never directed his acts at an individual. On the basis of current caselaw, we affirmed. If I were writing on a blank slate, however, I would have viewed this differently. And I think it's appropriate here to take the admittedly unusual step of writing separately to suggest that the caselaw regarding this element should be re-examined.

¶53    At the outset of the controlling statute, the term "[c]ourse of conduct" is defined as "two or more acts directed at or toward a specific individual." Utah Code § 76-5-106.5(1)(a)(i). In the next subsection, the statute repeats the same phrase, stating that an "actor commits stalking if the actor intentionally or knowingly . . . engages in a course of conduct directed at a specific individual." *Id.* § 76-5-106.5(2).

---

13. As indicated above, Part I(C) represents the views of Judge Tenney alone.

¶54 As discussed above, *Ragsdale* held that "the person toward whom a respondent's behavior is 'directed at' is not necessarily determined by his or her subjective intent." 2021 UT 29, ¶ 37. "Instead, it is determined by an objective assessment of whether the respondent engaged in conduct prohibited by the stalking statute." *Id.* Thus, according to *Ragsdale*, a district court should not determine whether the respondent "subjectively targeted" the petitioner. *Id.* ¶ 41.[14]

¶55 But in light of the plain language of the statute, I think this approach is misguided. And I also think it leads to an interpretation of the civil stalking statute that is too broad and creates systemic problems.

¶56 Starting with the statutory language, again, the statute turns on whether the respondent's acts were "*directed at . . . a specific individual.*" Utah Code § 76-5-106.5(1)(a)(i) (emphases added). The statute then lists a series of acts that can satisfy this portion of the course of conduct element. These include, as discussed, interfering with or even entering the individual's property. *See id.* § 76-5-106.5(1)(a)(i)(A), (B)(III). And they also include a range of other acts, such as appearing at the individual's workplace, contacting a neighbor, or sending materials to the individual. *See id.* § 76-5-106.5(1)(a)(i)(B)(II)–(IV).

---

14. I think it's at least possible that what *Ragsdale* meant was that the question is whether a reasonable person would objectively think that the respondent subjectively intended to direct the acts at the individual. But that's not what *Ragsdale* said. And if subjective intent is indeed the ultimate question under the analysis, it would make little sense to superimpose an objective person gloss on top of it. Questions of intent are commonly resolved by circumstantial evidence. As a result, as with any other case, the parties in a stalking case could seek to prove that the respondent had the requisite intent by pointing to circumstantial evidence.

¶57 But under the structure of the statute, all of these acts are placed under the umbrella of the operative element—namely, whether they were "directed at or toward a specific individual." *Id.* § 76-5-106.5(1)(a)(i). If they weren't "directed at or toward a specific individual," they accordingly don't qualify as an "act" that would support a civil stalking injunction.

¶58 In my mind, the phrase "directed at" naturally contemplates an act that is both intentional and targeted. And various dictionaries bear this out. When confronted with questions of statutory interpretation, "we begin our interpretive task by examining the ordinary meaning or usually accepted interpretation of the statutory language." *State v. Hatfield*, 2020 UT 1, ¶ 17, 462 P.3d 330 (quotation simplified). "When interpreting statutes, we look to the ordinary meaning of the words, using the dictionary as our starting point." *Id.* (quotation simplified); *see also* Utah Code § 68-3-11 ("Words and phrases are to be construed according to the context and the approved usage of the language . . . .").

¶59 Here, one dictionary defines "directed" as "pointed, aimed, or sent toward a place or object."[15] Another dictionary defines "direct" (as in "to impart orally") as "to adapt in expression so as to have particular applicability."[16] Consistent with these definitions, another dictionary defines the phrase "direct something at someone/something" as "to aim something in a particular direction or at a particular person."[17] To me, all of

---

15. *Directed*, Dictionary.com, https://www.dictionary.com/browse/directed [https://perma.cc/Y43G-9TPV].

16. *Direct*, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct [https://perma.cc/J6M8-47B7].

17. *Direct something at someone/something*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/direct-at [https://perma.cc/9FAU-Y2KK].

these definitions suggest an intentional and targeted act. For example, I don't think that a person would be said to "aim something . . . at a particular person" if reaching that person wasn't the intended point. Put differently, as a matter of ordinary usage, I don't think one would say that a person had *accidentally* aimed at a particular target.

¶60　I think this conclusion is reinforced by what appears at the back end of the same statutory provision. Again, the statute requires proof that the acts were directed at or toward "a specific individual." Utah Code § 76-5-106.5(1)(a)(i). To me, this naturally suggests (and indeed explicitly says) that there must be proof that the respondent wasn't just committing acts that could impact some person, but that the respondent was committing acts that were targeting a *particular* person.

¶61　True, while dictionaries are "often helpful," they "are not always the alpha and omega of the search for statutory meaning." *Armenta v. Unified Fire Auth.*, 2025 UT 26, ¶ 23, 573 P.3d 1283. Where warranted, courts should also look to "the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)." *Id.* ¶ 26 (quotation simplified). But I think the structure of this statute only reinforces the point. Again, the various things that the statute lists as acts that can qualify as a course of conduct are all placed under the broader requirement that they be "directed at" the specific individual.

¶62　I also think it's significant that this language appears within a stalking statute. Black's Law Dictionary defines stalking as the "offense of following or loitering near another, often surreptitiously, to annoy or harass *that person* or to commit a further crime such as assault or battery." *Stalking*, Black's Law Dictionary (12th ed. 2024) (emphasis added). To me, this likewise suggests that stalking is generally understood to involve an act or series of acts that are intentional and targeted at a particular person—which, again, is what our statute says.

¶63 Indeed, it seems to me that the actor's subjective intent is often the very thing that differentiates stalking from other behavior. To use just one example: our statute provides that a "[c]ourse of conduct" can include "enter[ing] property owned, leased, or occupied by an individual." Utah Code § 76-5-106.5(1)(a)(i)(B)(III). Suppose that a teenager is repeatedly crossing through a neighbor's backyard while playing night games. I wouldn't regard that teenager as engaging in conduct that is "directed at or toward a specific individual." *Id.* § 76-5-106.5(1)(a)(i). But suppose instead that a spurned lover is repeatedly entering the backyard of his former partner at night. I think that this behavior would naturally be viewed as an act that targets the former partner as a specific individual. And the thing that would make these two scenarios different is the actor's subjective intent. The teenager is trespassing because he or she wants to enter the property to play in a game, but the spurned lover is trespassing as a means of targeting this particular person. By removing subjective intent from the analysis, I think that *Ragsdale* broadened the scope of the stalking statute, thereby sweeping in conduct that doesn't fit the statute and isn't really stalking at all.

¶64 Indeed, I think this case provides another example of this problem. As discussed, most of the conduct at issue involves LeFevre entering Hasemeyer's property with a tractor, and on two of the occasions, LeFevre used it to damage Hasemeyer's property. Hasemeyer believed that LeFevre had no right to do so, but LeFevre thought that he could because of an easement. No one has contended that LeFevre was doing this because of personal animus toward Hasemeyer—i.e., that he was entering the property because of some grudge. Instead, this was about who has rights to this land.

¶65 In a separate civil case, the parties are currently litigating the question of whether the easement exists. But what's striking to me about all this is that this is a property dispute that has somehow morphed into a stalking case without any real

indication that Hasemeyer is being targeted as an individual. It's a decidedly odd fit, and while I think our result is compelled by the caselaw, I don't think it's compelled by the language or structure of the statute.

¶66    Finally, it's worth pointing out that adding subjective intent back into the mix would not leave property owners in a case like this one without a remedy. In his brief in this appeal, for example, LeFevre asserts that "Hasemeyer could (and should) have sought a temporary restraining order and preliminary injunction" under the Utah Rules of Civil Procedure "that would have been more tailored to the parties' needs." *See* Utah R. Civ. P. 65A(f) (providing that a court may issue a restraining order or preliminary injunction if, among other things, "the applicant will suffer irreparable harm unless the order or injunction issues"). As a systemic matter, this seems right to me. If a case is about interference with property, there are other mechanisms for obtaining temporary relief. But by design, the stalking statute is supposed to stop harm that's directed at an individual.

¶67    Given all this, I think that current precedent takes the stalking statute to a place that it's not supposed to go. I accordingly think that it should be reconsidered in the appropriate case.[18]

---

18. In theory, if subjective intent were added back into the analysis of this case, it could be argued that because LeFevre drove the tractor at Wife twice during the February incident, those two separate acts alone could support the civil stalking injunction (i.e., without also relying on LeFevre having trespassed on and destroyed property). But while the arguments and the ruling below did include, as predicate acts, LeFevre driving the tractor at Wife, they were largely focused on the trespass and destruction of property. In any event, the two tractor threats were fairly close in time, but the district court did not conclude that they qualified

(continued…)

## II. Evidentiary Hearing

¶68    LeFevre next argues that the district court improperly failed to hold an evidentiary hearing within ten days of his request. Because of this failure, LeFevre then argues that the court should have "vacated" the ex parte civil stalking injunction. We disagree.

¶69    If a petitioner obtains an ex parte civil stalking injunction, the statute states that "[w]ithin 10 days after the day on which the ex parte civil stalking injunction is served, the respondent is entitled to request, in writing, an evidentiary hearing on the civil stalking injunction." Utah Code § 78B-7-701(5)(a). The statute then states that the "court shall hold a hearing requested by the respondent at the earliest possible time and within 10 days after the day on which the request is filed with the court unless the court finds compelling reasons to continue the hearing." *Id.* § 78B-7-701(5)(b)(i).

¶70    As noted, LeFevre requested an evidentiary hearing on March 10, 2025, which was three days after the court issued the ex parte civil stalking injunction. The court held a hearing on March 24, and at that hearing, it said that it would not take evidence until April 7. After taking evidence at the April 7 hearing, the court continued the matter until April 21. At that April 21 hearing, the court heard closing arguments and then ruled on the injunction. Thus, the gap between LeFevre's request and the initial evidentiary hearing was 28 days, and the gap between his initial request and the ultimate ruling was 42 days. These are the delays that LeFevre targets on appeal.

---

as separate acts under the framework set forth in our cases for resolving this kind of question. *See, e.g.*, *Richins v. Weldon*, 2023 UT App 147, ¶¶ 47–55, 541 P.3d 274; *Hardy v. Hardy*, 2020 UT App 88, ¶ 8, 467 P.3d 931.

¶71 In their respective briefs, the parties have advanced several competing arguments about how this should have proceeded.

¶72 First, in defending what happened below, Hasemeyer points out that Utah Code section 78B-7-701(5)(b)(i) only says that a court must hold "a hearing" within ten days of the request. In his view, any hearing will do, and because the March 24 hearing was held within ten business days of the request, he thinks the court complied with its obligations. In response, LeFevre asserts that section 78B-7-701(5)(b)(i)'s reference to "a hearing" must mean "an evidentiary hearing." On the question of what kind of hearing is required, we agree with LeFevre.[19]

¶73 As noted above, when courts interpret a statutory provision, one of the things that courts look to is the statute's "context," and this includes "the structure and language of the statutory scheme." *Armenta*, 2025 UT 26, ¶ 26 (quotation simplified). Here, section 78B-7-701(5)(b)(i) requires a court to "hold a hearing requested by the respondent at the earliest possible time and within 10 days after the day on which the request is filed." In context, this seems to be a clear reference to the immediately preceding statutory provision—section 78B-7-701(5)(a)—which allows a respondent to request "in writing, an evidentiary hearing on the civil stalking injunction." And this interpretation is reinforced by the statutory provisions that immediately follow. In section 78B-7-701(5)(b)(ii), the statute states that "[a]t *the hearing*, the burden is on the petitioner to show *by a preponderance of the evidence* that stalking of the petitioner by the respondent has occurred." (Emphases added.) These are clear references to an evidentiary hearing, as opposed to some other

---

19. Hasemeyer does not provide legal support for his assertion that the statute requires the hearing to be held within ten *business* days. In any event, this does not matter in this case. As indicated below, we conclude that the statute requires an evidentiary hearing, and the evidentiary hearing that was ultimately held occurred well beyond ten business days.

kind of hearing. And section 78B-7-701(6)(a) then provides that "[a]t *the hearing*, the court may modify, revoke, or continue the injunction." (Emphasis added.) This, too, seems to be a reference to the actions that the court can take after receiving evidence on the allegations supporting the request for a civil stalking injunction. For these textual reasons, we agree with LeFevre that section 78B-7-701(5)(b)(i)'s reference to "a hearing" refers to the evidentiary hearing that the court must hold within ten days if requested by the respondent.

¶74 Second, in challenging what happened below, LeFevre argues that the district court never found that there were "compelling reasons to continue the hearing" as required by section 78B-7-701(5)(b)(i).

¶75 It's true that when the district court said, at the March 24 hearing, that it would not hold the evidentiary hearing until April 7, the court did not use the phrase "compelling reasons." But unlike LeFevre, we don't regard this as being dispositive. "Unstated findings can be implied if it is reasonable to assume that the district court actually considered" the matter and "necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made." *Globe Contracting LLC v. Hour*, 2025 UT App 98, ¶ 43, 575 P.3d 235 (quotation simplified).

¶76 Here, at the March 24 hearing, the parties and the district court had a discussion about this exact issue. LeFevre pointed the court to this very statutory scheme, asserted that he had "filed specifically for an evidentiary hearing, pursuant to the [statute]," and stressed his view that the statute "require[d] an evidentiary hearing for [LeFevre] within ten days of being served of the order."[20] In response to those assertions, the court stated that it

---

20. The latter part of this assertion was incorrect. As indicated, the statute requires the court to hold the evidentiary hearing "within

(continued…)

was continuing the hearing because it didn't have the "bandwidth to schedule these hearings within ten days." The court noted that "what we need to do today . . . is set the matter for an evidentiary hearing," and the court recognized "the sooner the better." The court noted that its "practice" with respect to civil stalking injunctions had been that "we come in, we set an evidentiary hearing, and we set it down the road. I understand that there's need for some immediacy here . . . ."

¶77    In our view, given the nature of the arguments that had been presented, the court's statement about the need to continue the evidentiary hearing because of "bandwidth" issues is most reasonably interpreted as being a statement that the court's bandwidth issues were the compelling reason that justified continuing the evidentiary hearing. In this sense, we conclude that this was an implied finding.

¶78    This leads to LeFevre's final argument, which is that the court's "bandwidth" and scheduling issues were not sufficiently compelling so as to allow it to continue the evidentiary hearing— either as a matter of law or on the facts of this case. We disagree.

¶79    The district courts in this state are under increasing demands in terms of their caseloads. On an aggregate level, the volume of cases alone creates obvious scheduling problems. And we also note that the civil stalking statute is not the only legal provision that requires a court to hold a particular hearing within a delineated (and usually short) time frame. *See, e.g.*, Utah Code § 38-9-205(3)(b) (requiring a court to "schedule a hearing within 10 days to determine whether [a] document is a wrongful lien");

---

10 days after the day on which the request is filed with the court unless the court finds compelling reasons to continue the hearing." Utah Code § 78B-7-701(5)(b)(i). But still, for these purposes, we think it's significant that LeFevre was clearly invoking the ten-day rule, albeit based on the wrong triggering date.

*id.* § 77-15-6(4)(a) (requiring a court to "hold a hearing to review the defendant's competency" "[w]ithin 15 days" after receiving an evaluator's report on competency); *id.* § 77-20-206(2)(b) (providing that a "judge who is unable to hold a detention hearing within 14 days of the date of an individual's first appearance shall make a good faith effort to identify another judge who has the ability to conduct the detention hearing within 14 days of the date of the individual's first appearance"); Utah R. Crim P. 7(e)(2) (providing that if a criminal defendant requests a preliminary hearing, the "hearing will be held within a reasonable time, but not later than 14 days after the request, if the defendant is in custody for the offense charged, and not later than 28 days after the request, if the defendant is not in custody").

¶80　In addition, we note that judges are often called upon to preside over trials that can last days or weeks or sometimes longer. And we further note that in some districts, there are only a few judges.

¶81　Putting all this together, it seems clear enough that if a particular judge is tasked with conducting an evidentiary hearing on a civil stalking injunction within ten days of a request, that request may well conflict with an ongoing trial or some other hearing that also cannot be rescheduled, or it may instead conflict with something else on the judge's calendar that cannot reasonably be moved. Depending on the circumstances, we think that such calendaring difficulties can qualify as a compelling circumstance that could justify continuing an evidentiary hearing.

¶82　But that said, the statutory command in question is direct. Again, it expressly requires a district court to hold such a hearing "within 10 days after the day on which the request is filed with the court unless the court finds compelling reasons to continue the hearing." Utah Code § 78B-7-701(5)(b)(i). And in context, there is obvious reason for the statutory urgency. An ex parte civil stalking injunction can put serious restraints on a person's life,

potentially prohibiting that person from visiting places or people who are important in the person's life. And because the initial injunction is an *ex parte* injunction, this means that the respondent has not yet had the opportunity to even contest the underlying allegations. Thus, the purpose of this statutory scheme is to give the respondent a chance to speedily challenge the ex parte civil stalking injunction in court.

¶83 In light of these concerns, we don't agree that a district court can delay the evidentiary hearing for just any reason. Instead, we believe that when a court decides whether it's appropriate to delay such a hearing, the court should balance (1) how compelling the reasons are for delaying the evidentiary hearing against (2) any assertion by the respondent of how he or she would be prejudiced by the extra delay (which would include, among other things, the nature and importance of the restrictions at issue).

¶84 To put this in the context of the justification at issue here—scheduling difficulties—if a court were in the midst of a multi-week murder trial, for example, such difficulties would provide a more compelling reason than they would if the court had several available days with no hearings. On the other side of the balancing, if the ex parte civil stalking injunction at issue prohibited the respondent from doing something critically important—going to work or seeing his or her children, for example—the court would need a more compelling reason to delay the hearing than it would if the ex parte civil stalking injunction did not interfere with things that are as important. We also think it would matter how long the extra delay is. A court would need a more compelling reason to delay an evidentiary hearing by a matter of weeks than it would to delay a hearing by just a few days. In conducting such a balancing, however, we stress that because this scheme is intended to allow a respondent to challenge an *ex parte* injunction, a court should do what it can to hold the evidentiary hearing as expeditiously as possible if it cannot hold the hearing within ten days of the request.

¶85 Turning to this case, the justification offered by the court had to do with scheduling problems, and the court noted that the next available two-hour window was over two months out. But even so, after discussing things further, the court agreed to schedule the evidentiary hearing for an earlier slot on April 7, 2025, which was a little less than a month after the request. When the parties' presentation of evidence ran over the allotted time, the court concluded that hearing on April 21, which was about a month and a half after the request.

¶86 Given that the statute gives ten days as the presumptive timeframe, we would hope that in most cases, an evidentiary hearing on an ex parte civil stalking injunction could happen and be concluded sooner than a month and a half after the request. But that said, we note here that the ex parte civil stalking injunction in question did not keep LeFevre from seeing people in his life, nor did it keep him from accessing his house or place of employment. Instead, it prohibited LeFevre from entering his neighbor's property—and, by extension, using the claimed easement to build an access road to an undeveloped part of his own property. While we're sensitive to LeFevre's claim that this delayed his ability to build his desired house, we don't regard these concerns as being so pressing that the district court could not reasonably delay the evidentiary hearing by about a month and a half to accommodate its scheduling issues. For these reasons, we're not persuaded that there was any reversible error based on this delay.

### III. Ability to Issue the Civil Stalking Injunction

¶87 LeFevre next argues that as a matter of law, the court could not issue the civil stalking injunction because there was a pending civil case regarding the easement. In support of this argument, LeFevre points to other types of protective orders that are available under Utah law and notes that some of them have statutory provisions that provide guidance on how the court's determination in those matters can interact with "a pending civil action between the parties." LeFevre argues that in the civil

stalking injunction scheme, on the other hand, there is no statutory basis "that permits a petitioner to seek a 'civil stalking injunction' while a separate civil action is pending." LeFevre argues that this difference is "intentional" and that, "[u]nderstood in context," and by way of what's essentially negative legislative inference, "a petitioner is barred from seeking" a civil stalking injunction if there are "other pending proceedings."

¶88    This is a creative argument, but we have no occasion to address it. "Under our adversarial system, the parties have the duty to identify legal issues and bring arguments, and if they fail to raise an issue at the appropriate time, they risk losing the opportunity to have the court address that issue." *Hillam v. Hillam*, 2024 UT App 102, ¶ 30, 554 P.3d 1137 (quotation simplified). "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). "Although new arguments, when brought under a properly preserved issue or theory, do not require an exception to preservation, an argument based upon an entirely distinct legal theory is a new claim or issue and must be separately preserved." *Hillam*, 2024 UT App 102, ¶ 30 (quotation simplified).

¶89    In the proceedings below, LeFevre only mentioned the pending civil case in passing at the close of the evidentiary hearing. But we see no place where he ever argued that the separate civil case legally prevented the district court from issuing a civil stalking injunction, much less where he advanced the intricate theory he advances on appeal. This issue is accordingly unpreserved, and we therefore decline to address it.

### IV. Scope of the Civil Stalking Injunction

¶90    Finally, LeFevre argues that the civil stalking injunction was too broad. In his view, civil stalking injunctions are subject to "specific, statutorily defined parameters," which are not "limitless." Yet according to LeFevre, "the district court

effectively quieted title in the disputed easement in Hasemeyer by broadly ordering LeFevre to 'stay away' from Hasemeyer's home, premises or property for at least the next three years." He thus argues that the civil stalking injunction "should have been more limited."

¶91 But in our view, these restrictions were within the scope of the district court's discretion for a properly issued civil stalking injunction. The governing statute affords the district court broad discretion in defining the terms of the injunction. The relevant subsection provides a list of potential relief options—including restraining the respondent from coming near the petitioner's residence—followed by the directive that the court may include in the injunction "*any other relief* necessary or convenient for the protection of the petitioner and other specifically designated individuals under the circumstances." Utah Code § 78B-7-701(4)(a)(iv) (emphasis added). And while LeFevre points out that these restrictions conflict with his claim that there's an easement, we note that the question of whether this easement exists is currently before a different district court judge in the separate civil case. If LeFevre prevails in that litigation, he would then be entitled to return to this case and ask the court to modify or revoke the injunction. *See id.* § 78B-7-701(8) (providing that a civil stalking injunction may be dissolved or modified if the respondent shows good cause). But for now, and on the state of the current record and procedural posture, we are not persuaded that the injunction is overly broad.

CONCLUSION

¶92 For the reasons set forth in this opinion, we see no error in the court's decision to issue a civil stalking injunction. We accordingly affirm.

———————